591 F.2d 537
 14 ERC 1299, 9 Envtl. L. Rep. 20,137
 STATE OF ALASKA & Mauneluk Association, Appellants,
v.
Cecil D. ANDRUS, Secretary of the Interior, Appellee,
v.
DEFENDERS OF WILDLIFE et al., Intervenors.
STATE OF ALASKA & Mauneluk Association, Appellees,
v.
Cecil D. ANDRUS, Secretary of the Interior, Defendant,
v.
DEFENDERS OF WILDLIFE et al., Appellants.
 Nos. 77-3169, 77-3408.
 United States Court of Appeals,
Ninth Circuit.
 Feb. 22, 1979.
 
 William T. Council, Asst. Atty. Gen. (argued), Juneau, Alaska, for State of Alaska.
 Karin P. Sheldon (argued), Thomas B. Stoel, Jr., Washington, D. C., for Defenders of Wildlife.
 James W. Moorman, Robert L. Klarquist (argued) of Dept. of Justice, Washington, D. C., G. Kenneth Gilleland, Tallahassee, Fla., for Secretary of the Interior.
 Appeal from the United States District for the District of Alaska.
 Before WRIGHT and GOODWIN, Circuit Judges, and JAMESON*, District Judge.
 GOODWIN, Circuit Judge:
 
 
 1
 This appeal presents the question whether the Secretary of Interior's nonexercise of executive power (which he may or may not possess) to regulate wildlife on federal land in Alaska requires him to file an environmental impact statement. Because we hold that the nonexercise of power by an executive-branch officer does not call for compliance with NEPA[1] we do not reach the intriguing questions of statutory construction and application that would lurk in defining the Secretary's power to supersede the State in managing wildlife. We affirm the judgment which declared that the statement was not necessary.
 
 
 2
 The legal contest has bounced back and forth between the courts of the District of Columbia Circuit and this circuit. In the District of Columbia, on February 4, 1977, Defenders of Wildlife and several other animal-welfare groups (Defenders) filed an action against Cecil D. Andrus, Secretary of Interior. The action prayed the District Court to order the Secretary to halt a program of the State of Alaska in which State-licensed gunmen were killing from the air numbers of wolves that roam federal lands within the State's borders.
 
 
 3
 The wolf-killing had been designed to relieve pressure upon the caribou herd in the affected region. The caribou population had decreased, according to State estimates, from more than 240,000 in 1970 to about 60,000 in 1976. By killing the wolves, which prey on caribou, and curtailing subsistence hunting of caribou by Alaska natives, the State hoped to reverse the shrinkage of the herd.
 
 
 4
 Defenders based its theory on the contention that two federal statutes empower the Secretary to close the federal lands to the wolf-kill program: the Federal Land Policy and Management Act of 1976, 43 U.S.C.A. § 1701 Et seq. (1978 Pocket Supp.) (also known as "the BLM Organic Act" and "FLPMA"), and the Alaska Native Claims Settlement Act, 43 U.S.C. § 1601 Et seq. (Supp. V 1975). Because the Secretary has the power, Defenders argued, the Secretary was required by NEPA to prepare an environmental impact statement before choosing to exercise or to refrain from exercising the power.
 
 
 5
 The District Court for the District of Columbia issued a preliminary injunction which compelled the Secretary to order the State to halt the program. The Secretary issued a directive that the State halt the kill. The State stopped killing wolves, and the Secretary appealed the preliminary injunction to the Court of Appeals for the District of Columbia Circuit. That case is now pending.
 
 
 6
 The State of Alaska was not a party to the D.C. litigation, however, and shortly after the Secretary had the State stop killing the wolves, the State filed its own action this one in the District Court for the District of Alaska.
 
 
 7
 In this action, the State asked the court to declare that the Secretary had no power to stop the wolf kill. The State also asked the court to hold that even if the Secretary did possess that authority he was not required to prepare an environmental impact statement. In addition to the desired declaratory judgment, the State sought an order that the Secretary "take all steps necessary to rescind" his "request" that the wolf-kill program be halted.
 
 
 8
 The Secretary, as he had in the District of Columbia case, protested that he had no power to stop the killing; he told the Alaska district court that he had issued his directive to the State only because he had been ordered to do so by the District of Columbia court. Defenders then intervened in the Alaska case, making the same arguments it had made with initial success in the District of Columbia.
 
 
 9
 On April 11, 1977, the district court in Alaska, on motions for summary judgment, held that the Secretary had the power to halt the wolf-kill program, but that, nonetheless, no environmental impact statement was necessary if he refrained from exercising that power. Other than this declaratory relief, the "final judgment" granted no relief to any party.
 
 
 10
 The State and Defenders of Wildlife then brought these appeals from the Alaska district court judgment. The State contends that the Secretary has no power to stop the wolf kill. In this stand the State is joined by amici curiae: officials of 11 states and the International Association of Fish and Wildlife Agencies. Meanwhile, Defenders seeks affirmance of the declaration that the Secretary does have the power to stop the killing, but reversal of the ruling that he need not file an environmental impact statement. The Secretary also appealed, but after reversing his earlier stand and "conceding" that he Does have power to stop the wolf kill, he withdrew the appeal.
 
 I.
 
 11
 Before reaching the merits, we note jurisdiction. Defenders suggests that the "final judgment" filed by the district court in Alaska is not a " final decision" on the State's claim within the meaning of28 U.S.C. § 1291, under which jurisdiction is claimed here. Although the document embodying the "final judgment" does not contain an express rejection of the State's prayer for permanent injunctive relief, two orders filed by the district court show that it had rejected injunctive relief. In its orders dated March 16, 1977, and April 11, 1977, the court gave clear evidence of its intent that the "final judgment" of April 11 be the last decision in this case. The opinions show an unwillingness by the Alaska judge to order the Secretary to do anything inconsistent with the injunction from the District of Columbia court. Denial of the permanent injunction sought by the State against the Secretary can fairly be inferred from these documents. Under the "common-sense" approach of Bankers Trust Co. v. Mallis, 435 U.S. 381, 387, 98 S.Ct. 1117, 55 L.Ed.2d 357 (1978), the judgment rendered April 11, 1977, (and from which Defenders of Wildlife appeals) was a "final decision" reviewable by this court.
 
 II.
 
 12
 Under the prior decisions of this court, even if the Secretary had some power under a delegation by Congress to stop the wolf-kill program, his failure to exercise that power in effect, his inaction was not the type of conduct that requires an environmental impact statement.
 
 
 13
 NEPA mandates that federal agencies file impact statements when they propose to take a leading role in activity affecting the environment. For example, the Federal Aviation Administration, which operates Washington National Airport, was required to file an impact statement before a planned $26-million expansion of that airport to handle booming operations. Virginians for Dulles v. Volpe, 541 F.2d 442 (4th Cir. 1976).
 
 
 14
 There can be major federal action when the primary actors are not federal agencies, but rather state or local governments, or private parties. Most courts agree that significant federal funding turns what would otherwise be a local project into a major federal action. See Homeowners Emergency Life Protection Committee v. Lynn, 541 F.2d 814 (9th Cir. 1976) (per curiam) (federal disaster-relief funding for municipal dam and reservoir project).
 
 
 15
 Even when federal funding is absent, some courts find major federal action where federal agencies issue permits, approve plans, or give other "go-ahead" signals. In Davis v. Morton, 469 F.2d 593 (10th Cir. 1972), the court held that the Secretary of Interior should have filed an environmental impact statement before approving a lease of lands by Indians to a private developer. The court cited the Secretary's fiduciary duties over the Indians' land as the source of the major action. A federal statute, 25 U.S.C. § 415, required the Secretary's approval before the lease could become effective, and the lease itself required his approval before the land could be encumbered. But the Secretary's role as "trustee" was the factor crucial to the court's decision.
 
 
 16
 The Tenth Circuit again found major federal action in Scenic Rivers Association of Oklahoma v. Lynn, 520 F.2d 240, 244 (10th Cir. 1975). There, the Secretary of Housing and Urban Development was held to have taken major federal action in fulfilling his duties under the Interstate Land Sales Full Disclosure Act. Those duties were modest. The Act required disclosure statements by developers, and the Secretary merely checked the filings for adequacy and frankness before they became "of record". He had no power to evaluate the substance of the developer's plans. Nonetheless, the court declared that the approval of the statements constituted major federal action. The Supreme Court reversed on other grounds. Flint Ridge Development Co. v. Scenic Rivers Association of Oklahoma, 426 U.S. 776, 96 S.Ct. 2430, 49 L.Ed.2d 205 (1976).
 
 
 17
 In Natural Resources Defense Council, Inc. v. Morton, 388 F.Supp. 829 (D.D.C.1974), Aff'd mem., 174 U.S.App.D.C. 77, 527 F.2d 1386 (D.C. Cir.), Cert. denied, 427 U.S. 913, 96 S.Ct. 3201, 49 L.Ed.2d 1204 (1976), the court held that the Bureau of Land Management could not fulfill its duties under NEPA by issuing only one environmental impact statement for its livestock grazing permit program, which covered 11 western states. The court required the BLM to consider the environmental effects of the program in each of the 52 districts in which it was to issue grazing permits. The court stated:
 
 
 18
 "The term 'actions' refers not only to actions taken by federal agencies, but also to decisions made by the agencies, such as the decision to grant a license, which allow another party to take an action affecting the environment." Natural Resources Defense Council, Inc. v. Morton, 388 F.Supp. at 834.
 
 
 19
 Jones v. Lynn, 477 F.2d 885 (1st Cir. 1973), took this notion even further. The court began with the proposition that an urban-renewal contract signed before the effective date of NEPA could not trigger the need for an impact statement. It ruled, however, that later amendments to the contract, between federal and local governments, could be major federal actions. The key questions of fact on remand turned out to be whether the amendments gave the Secretary discretion to alter the future course of the project, and whether future assistance from the federal government was likely. The mere likelihood of federal action to alter the plan was said to create major federal action for the purposes of that case.
 
 
 20
 The Ninth Circuit, however, has not been receptive to arguments that impact statements must accompany inaction, or actions that are only marginally federal. Where federal funding is not present, this court has generally been unwilling to impose the NEPA requirement. E. g., Friends of the Earth, Inc. v. Coleman, 518 F.2d 323 (9th Cir. 1975) (mere federal approval of aspects of airport expansion insufficient).
 
 
 21
 This court's reluctance to adopt an expansive view of the NEPA provision is also illustrated by Molokai Homesteaders Cooperative Association v. Morton, 506 F.2d 572 (9th Cir. 1974). There, the Secretary of Interior had loaned funds to a state land board before NEPA was effective. When the board sought to rent water facilities to a resort developer, homesteaders charged that the contract was a major federal action under NEPA, but this court disagreed:
 
 
 22
 "The right of the federal government to object to violations of its loan agreements, or its determination not to object, cannot realistically be classified as 'Federal action,' much less 'major' federal action." Molokai Homesteaders Cooperative Association v. Morton, 506 F.2d at 580.
 
 
 23
 San Francisco Tomorrow v. Romney, 472 F.2d 1021 (9th Cir. 1973), is another case inconsistent with the position of Defenders. In that case, this court held that the Department of Housing and Urban Development had completed its "action" in funding an urban development project before NEPA, when it signed a loan and grant contract. On the agency's continuing role in the project, we rejected the argument that HUD's "contractual right to monitor the project as it develops to assure compliance with statutory and contractual requirements" constituted major federal action. 472 F.2d at 1025. See also Named Individual Members of San Antonio Conservation Society v. Texas Highway Department, 496 F.2d 1017 (5th Cir. 1974) (federal officials had no jurisdiction over highway project, and all federal funds for road had been returned; held, no federal action).
 
 
 24
 No federal funds are to be spent, nor federal agents employed, in the wolf-kill program. The Secretary's nonexercise of any authorities and duties he may possess in the field of wildlife management was, at most, a nonuse of a power of supervision akin to those at issue in Friends of the Earth, Inc. v. Coleman, Molokai Homesteaders Cooperative Association v. Morton, and San Francisco Tomorrow v. Romney.
 
 
 25
 We hold that the district court was correct in declaring that no environmental impact statement was necessary before the Secretary could stay his hand and allow the State of Alaska to manage its own wildlife. It is unnecessary for us to decide the exact scope, if any, of the Secretary's power to stop the program. Even if it is a broad power, the decision not to exercise it here does not trigger the NEPA requirement that an environmental impact statement be prepared.[2]
 
 
 26
 The judgment, insofar as it declares that an environmental impact statement was not required, is affirmed. We express no opinion on the other terms of the judgment, as they do not presently affect the rights of any party.
 
 
 27
 Affirmed.
 
 
 
 *
 The Honorable William J. Jameson, United States District Judge for the District of Montana, sitting by designation
 
 
 [1]
 The National Environmental Policy Act of 1969, particularly 42 U.S.C. § 4332(C)
 
 
 [2]
 While this appeal was pending, the Council on Environmental Quality issued its final regulations implementing the procedural requirements of NEPA. 43 Fed.Reg. 55978-56007 (Nov. 29, 1978). We have read these regulations, and the comments thereto, and do not believe they compel a ruling that the executive officer's inactivity here was a major federal action, or that there was a "proposal" for such action