# DEFENDERS OF WILDLIFE et al.,

### v.

# Cecil D. ANDRUS, in his official capacity as Secretary of the Interior, et al., Appellants.

## No. 79–1410.

United States Court of Appeals, District of Columbia Circuit.

### Feb. 5, 1980.

### Rehearing Denied March 6, 1980.

Dirk D. Snel and Robert L. Klarquist, Attys., Dept. of Justice, Washington, D. C., were on brief, for appellant.

Karin P. Sheldon, Gregory A. Thomas and Thomas B. Stoel, Jr., Attys., Natural Resources Defense Council, Inc., Washington, D. C., were on brief, for appellees.

Before McGOWAN, LEVENTHAL * and MacKINNON, Circuit Judges.

Opinion for the Court filed by Circuit Judge McGOWAN.

McGOWAN, Circuit Judge:

This is an appeal from an order of the District Court granting a preliminary injunction against the Secretary of the Interior. It raises the question of whether, under the circumstances of this case, the National Environmental Policy Act obligates the Secretary to prepare and circulate an environmental impact statement when he does not act to prevent the State of Alaska from

---

\* Circuit Judge LEVENTHAL was a member of the panel assigned to hear this case. He concurred in the decision to decide this case without oral argument, but died and did not take part in the decision of the case.

conducting, as part of a wildlife-management program, a wolf hunt on certain federal land. Because the Secretary's conduct here does not constitute a "major Federal action" within the meaning of the Act, we hold that the Secretary is not so obligated, and we reverse.

I

*The Background of this Action*

On February 16, 1979, the Alaska Department of Fish and Game (ADFG) announced a program whose aim was to kill from aircraft 170 wolves (approximately sixty percent of the wolf population) in an area of 35,000 square miles in the interior part of the state. Many, perhaps most, of the wolves were to be killed on federal lands for which the Department of the Interior is responsible. On February 23, counsel for one of the appellees, Natural Resources Defense Counsel, Inc., asked the Department to prepare an environmental impact statement for Alaska's program before allowing it to begin. The Department, however, did not exercise whatever authority it may have to stop the program and did not prepare an impact statement. On March 12, appellees—organizations and individuals interested in the preservation of the environment in general and of wildlife in particular[1]—filed a complaint asking for declaratory and injunctive relief against appellants—the Secretary and two other officials of the Department of the Interior.

The complaint predicted that, although the wolf hunt was proposed in order to increase the number of moose in the region by decreasing the numbers of their major predator, it would in fact weaken the moose herds by ending a "culling process [which] is natural selection in action, and [which] assures survival of the fittest moose . . ." and would devastate the wolf packs even

beyond the ADFG's estimates. This interference with these two major species, the complaint continued, would disrupt the ecology of the entire area.

The complaint asserted that the Federal Land Policy and Management Act (FLPMA), 43 U.S.C. § 1701 *et seq.*, authorizes the Secretary of the Interior to prevent the killing of wildlife on federal lands and requires him to evaluate whether he must intervene if he is fully to serve the environmental concerns of the Act. The complaint claimed as one of its "Violations of Law" that appellants failed to make that evaluation. The other violation of law the complaint alleged is that appellants had, but failed to meet, an obligation under § 102(2)(C) of the National Environmental Policy Act (NEPA), 42 U.S.C. 4321 *et seq.*, to prepare an environmental impact statement before deciding not to prevent Alaska from killing wolves on Federal land.

On March 13, 1979, the United States District Court for the District of Columbia issued a temporary restraining order which enjoined appellants to "take all steps necessary to halt the aerial killing of wolves by agents of the State of Alaska" on the relevant federal lands. Although Alaska has apparently continued to kill wolves on its own lands, it has discontinued doing so on federal lands.

On March 23, 1979, the District Court acted on appellees' motion for a preliminary injunction. It first denied appellants' requests to transfer the action to the District of Alaska, pursuant to 28 U.S.C. § 1404(a), and to dismiss the action for failure to join Alaska as an indispensable party, pursuant to Fed.R.Civ.P. 19(a).[2] The Court said that it would inconvenience both parties to transfer the action to Alaska and that, "[a]lthough Alaska has an interest in the

---

1. Appellees (plaintiffs below) are Defenders of Wildlife; Natural Resources Defense Council, Inc.; International Fund for Animal Welfare; The Humane Society of the United States; The Fund for Animals; Animal Welfare Institute; The Wild Canid Survival and Research Center—Wolf Sanctuary; World Wildlife Fund–U.S.; James C. Pitts; and Carol A. Gates.

2. On appeal, the Secretary presses the argument that the District Court erred in denying the latter of these requests. Since we reverse the District Court's order on other grounds, we need not reach that argument.

outcome in this matter, the Court notes that the interest is not so great as to prompt a motion to intervene."

The District Court then weighed the merits of the motion for a preliminary injunction in the scales this court constructed in *Virginia Petroleum Jobbers Association v. Federal Power Commission*, 104 U.S.App. D.C. 106, 259 F.2d 921 (1958). The District Court came to the following conclusions:

(1) Plaintiffs would be irreparably harmed if no injunction were issued, since without one, the killing of wolves would soon begin and the natural environment of the federal lands would thereby be damaged. Further, plaintiffs' rights under NEPA to an impact statement would be irretrievably lost if the wolves were killed before the statement was written.

(2) An injunction would not unduly injure the defendants, since they had not invested time or resources in the program to hunt wolves.

(3) "There exists a strong public interest under NEPA in having federal officials consider the potential environmental effects on national lands and resources prior to the occurrence of a highly controversial and potentially devastating wolf control program."

(4) There was a substantial likelihood plaintiffs would win on the merits.

As to those merits, the District Court believed it was "confronted with a simple question: Does NEPA require the Secretary of the Interior to prepare an EIS prior to permitting an extensive wolf kill to take place on federal lands?" The District Court reasoned that FLPMA requires the Secretary "to *manage* and *plan* the use of federal lands" and that "[c]learly, an environmental assessment of the wolf elimination program must be part of the decisionmaking process." The District Court therefore issued a preliminary injunction which required appellants "to prevent any such killing of wolves pending preparation of an environmental impact statement on the potential effects of the wolf control program."

## II

### Earlier Related Cases

This is not the first time a federal court has been asked to order the Secretary of the Interior to keep Alaska from killing wolves on federal land. In 1976, the Alaska Department of Fish and Game announced that it proposed to kill about eighty percent of the wolves in three of its game-management units. Many of the plaintiffs in the case presently before us asked the District Court for the District of Columbia (the Hon. Oliver Gasch) for an injunction similar to the one we are now reviewing. *Defenders of Wildlife v. Andrus*, 9 ERC 2111 (Feb. 14, 1977). They contended that the Secretary of the Interior had violated FLPMA, the Alaska Native Claims Settlement Act (ANCSA), 43 U.S.C. § 1601 *et seq.*, and NEPA by failing (1) to assess the environmental consequences of killing wolves and (2) to prepare an environmental impact statement. The Secretary responded that he lacked authority to close federal land to state wildlife-management programs.

Judge Gasch decided, after examining the language and legislative history of FLPMA and ANCSA, that the Secretary does have that authority. Judge Gasch did not reach the question of what obligations ANCSA imposed on the Secretary, but he did conclude that "plaintiffs have shown a very substantial likelihood of success on the merits of their claim that defendants have violated the requirements of NEPA by not preparing an environmental impact statement . . . ." *Defenders of Wildlife v. Andrus*, 9 ERC at 2118. Judge Gasch therefore granted the request for a preliminary injunction.

After that injunction issued, the Secretary ordered the Governor of Alaska, by telegram, not to kill wolves on the relevant federal land. Alaska complied, but brought an action in the District Court for Alaska (the Hon. James von der Heydt) which asked the court to declare the Secretary's order a violation of the Alaska Statehood Act, 48 U.S.C. Chap. 2, § 6(e), and to enjoin the Secretary to withdraw that order. *Alaska v. Andrus*, 429 F.Supp. 958 (D.C.

Alaska 1977). Plaintiffs in the action over which Judge Gasch presided intervened in the Alaska suit. Like Judge Gasch before him, Judge von der Heydt found that the Secretary had the power to close federal lands to state wildlife-management programs, but he held that the Secretary need not exercise that power, since the Secretary's failure to prevent the state from carrying out its program did not convert that program into "a major federal action triggering NEPA requirements." *Id.* at 962. He conceded that several cases hold that

> certain decisions by federal agencies which allow others to take action affecting the environment can constitute federal action. . . . *The distinguishing feature of each of these cases, however, is that before the non-federal party could act there had to be some affirmative conduct on the part of the federal government.*

*Id.* (emphasis added). Judge von der Heydt found it "a strained chain of logic which turns totally non-federal action into federal action just because the Secretary has the power to regulate the activity." *Id.* at 963. Finally, he reasoned that the Alaska Native Claims Settlement Act imposes "no independent duty on the Secretary to require licenses or permits to hunt on these lands and cannot be the basis for a determination that there is federal action involved in these hunts." *Id.* This declaration of the law was the sole relief the court granted.

The state and the intervenors appealed to the Court of Appeals for the Ninth Circuit.[3] *Alaska v. Andrus*, 591 F.2d 537 (9th Cir. 1979). That court affirmed, holding that, "even if the Secretary had some power under a delegation by Congress to stop the wolf-kill program, his failure to exercise that power—in effect, his inaction—was not the type of conduct that requires an environmental impact statement." *Id.* at 540. The court noted that it has always hesitated to describe as "federal" programs in which

federal funds are not spent and federal agents are not employed.

Meanwhile, the Secretary had appealed from Judge Gasch's grant of a preliminary injunction. *Defenders of Wildlife v. Andrus*, 193 U.S.App.D.C. 217, 593 F.2d 1371. On March 16, 1979, after the Ninth Circuit had handed down its decision, we vacated the injunction and directed that the complaint be dismissed "for want of equity." In an unpublished memorandum accompanying our order, we said that "[s]ound principles of comity dictate that this court should not undertake an independent examination of the issues resolved by the Ninth Circuit ruling." We also noted that recent developments in the case had infected it with a staleness which made the grant of equitable relief, always a matter within the court's discretion, inappropriate.

### III

*Scope of Review*

■ A preliminary injunction, of course, is an extraordinary remedy which a district court has discretion to grant or deny, and a grant of that remedy may generally be reversed only when the court has abused its discretion. However, as we said in *Natural Resources Defense Council v. Morton*, "a greater amplitude of judicial review is called for when the appeal presents a substantial issue that the action of the trial judge was based on a premise as to the pertinent rule of law that was erroneous." 148 U.S.App.D.C. 5, 10, 458 F.2d 827, 832 (D.C. Cir. 1972). This appeal presents such an issue, and that "greater amplitude of judicial review" requires us here to review "fully and de novo," *Delaware & Hudson Ry. Co. v. United Transp. Union*, 146 U.S.App.D.C. 142, 159, 450 F.2d 603, 620 (D.C. Cir. 1971), *cert. denied*, 403 U.S. 911, 91 S.Ct. 2209, 29 L.Ed.2d 689 (1971), the District Court's pivotal finding that the Secretary of the Interior must prepare an impact statement under the circumstances of this case. Since we find that, as a matter of

---

**3.** The Secretary also appealed. Before the case was decided, however, he reversed his earlier stand by concluding he had authority to close

federal lands to Alaska's wolf hunt. He therefore withdrew his appeal.

law, that premise is mistaken, the grant of a preliminary injunction may and must be reversed.

## IV

*The Secretary's Obligations Under NEPA*

In 1973, Congress came to feel "that our Nation's present state of knowledge, our established public policies, and our existing governmental institutions are not adequate to deal with the growing environmental problems and crises the Nation faces." S.Rep. 91–296, 91st Cong., 1st Sess. 4 (1969). Congress therefore passed the National Environmental Policy Act, a law whose purpose is "[t]o declare a national policy which will encourage productive and enjoyable harmony between man and his environment; [and] to promote efforts which will prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of man . . . ." 42 U.S.C. § 4321. To ensure that federal agencies act to effectuate that purpose by anticipating and assessing the environmental consequences of their programs, Congress in section 102(2)(C) of NEPA required agencies to

> include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on—
>
> (i) the environmental impact of the proposed action . . . .

42 U.S.C. § 4332(2)(C).

Such "action-forcing" provisions of NEPA, we have said, "are not highly flexible. Indeed they establish a strict standard of compliance." *Calvert Cliffs' Coordinating Committee, Inc. v. Atomic Energy Commission*, 146 U.S.App.D.C. 33, 36, 449 F.2d 1109, 1112 (D.C. Cir. 1971).

A

Having laid out the statutory background of this action, we turn to the specific issue we must resolve. Does NEPA require that the Secretary prepare and circulate an environmental impact statement in the circumstances of this case?[4]

Our discussion of that question must center around the fact that, while the plain language of the statute calls for an impact statement when there is "major Federal action," here it is the Secretary's *inaction* which is complained of. Appellees, as we understand them, respond that (1) the environmental consequences of inaction may be greater than the consequences of action, and (2) the purpose of the statute is to ensure that environmentally informed decisions are made, not simply that the environmental consequences of all federal programs are considered. We acknowledge the truth of the first response, but we do not understand it to change the language of the statute.

As to the second response, we agree that a purpose of the statute is to ensure that environmentally informed decisions are made. Nevertheless, as it is written, NEPA only refers to decisions which the agency anticipates will lead to actions. This common-sense reading of the statute is confirmed by the statutory directive that the impact statement is to be part of a "recommendation or report" on a "proposal" for action. That is, only when an agency reaches the point in its deliberations when it is ready to propose a course of action need it be ready to produce an impact statement. As the Supreme Court said in *Andrus v. Sierra Club*, "Of course an EIS need not be promulgated unless an agency's planning ripens into a 'recommendation or report on proposals for legislation [or] other major Federal actions significantly affecting the quality of the human environment.' ", 442 U.S. 347, 350 n.2, 99 S.Ct. 2335, 2337 n.2, 60 L.Ed.2d 943 (1979). Logically,

---

4. The Ninth Circuit, of course, has already answered this question in the negative. *Alaska v. Andrus*, 591 F.2d 537 (1979). *See* Part II, *supra*. We address the question at some length, however, because while our answer is the same as the Ninth Circuit's, our reasoning is somewhat different.

then, if the agency decides not to act, and thus not to present a proposal to act, the agency never reaches a point at which it need prepare an impact statement.

The seriousness with which the Supreme Court takes the requirement of a proposal to act is illustrated by *Kleppe v. Sierra Club*, 427 U.S. 390, 96 S.Ct. 2718, 49 L.Ed.2d 576 (1976). There, the Court confronted a case in which it was asked to compel an agency to prepare an impact statement where, the Court believed, the agency had not proposed that it act. The Court summarized the problem: "Respondents can prevail only if there has been a report or recommendation on a proposal for major federal action with respect to the Northern Great Plains region. Our statement of the relevant facts shows there has been none; instead, all proposals are for actions of either local or national scope." 427 U.S. at 399, 96 S.Ct. at 2725. There being no proposal for regional action, no impact statement for a regional action plan was necessary. The Court said:

> Quite apart from the fact that the statutory language requires an impact statement only in the event of a proposed action, respondents' desire for a regional environmental impact statement cannot be met for practical reasons. In the absence of a proposal for a regional plan of development, there is nothing that could be the subject of the analysis envisioned by the statute for an impact statement.

427 U.S. at 401, 96 S.Ct. at 2726 (footnote omitted).

Similarly, the Court insisted in *Aberdeen & Rockfish Railroad v. SCRAP (SCRAP II)* that

> the time at which the agency must prepare the final "statement" is the time at which it makes a recommendation or report on a *proposal* for federal action. Where an agency initiates federal action by publishing a proposal and then holding hearings on the proposal, the statute would appear to require an impact statement to be included in the proposal and to be considered at the hearing. Here, however, until the October 4, 1972, re-

port, the ICC had made no proposal, recommendation, or report. . . . Thus, the earliest time at which the *statute* required a statement was the time of the ICC's report of October 4, 1972—some time after the oral hearings.

422 U.S. 289, 320–21, 95 S.Ct. 2336, 2355, 2356, 45 L.Ed.2d 191 (1975). (The emphases are the Court's, though we would have provided them had the Court not done so.)

None of this is to say that agencies may, by manipulating the time at which they actually develop recommendations or reports on proposals, seek to avoid or perniciously to delay preparing an impact statement. It is simply to confirm that Congress did not expect agencies to prepare statements if there is to be no action.

## B

■ Appellees argue that, by not inhibiting an action of a private party or a state or local government, the federal government makes that action its own within the meaning of NEPA. However, in no published opinion of which we have been made aware has a court held that there is "federal action" where an agency has done nothing more than fail to prevent the other party's action from occurring. Even here courts have not abandoned the requirement that it must be a specifically *federal* action which triggers the preparation of an impact statement. To borrow from the language of the criminal law of conspiracy, we may say that federal "approval" of another party's action does not make that action federal unless the federal government undertakes some "overt act" in furtherance of that other party's project. Thus, when the Supreme Court discussed two circuit court decisions which held that private actions permitted by the federal government might necessitate the preparation of an impact statement, the Court's examples of federal "permission" were such concrete acts as decisions "to issue a lease, approve a mining plan, issue a right-of-way permit, or *take other action to allow private activity . . . .*" *Kleppe v. Sierra Club*, 427 U.S. 390, 399, 96 S.Ct. 2718, 2725, 49 L.Ed.2d 576 (1976) (emphasis added).

Appellees quote language from our decision in *Scientists' Institute for Public Information, Inc. (SIPI) v. Atomic Energy Commission*, 156 U.S.App.D.C. 395, 404–05, 481 F.2d 1079, 1088–89 (1973):

> [T]here is "Federal action" within the meaning of the statute not only when an agency proposes to build a facility itself, but also whenever an agency makes a decision which permits action by other parties which will affect the quality of the environment. NEPA's impact statement procedure has been held to apply where . . . the federal agency took action affecting the environment in the sense that the agency made a decision which permitted some other party—private or governmental—to take action affecting the environment.

*Quoted in* Appellee's Brief at 26–27 (footnotes omitted by appellees). However, an examination of the material which appellees deleted reveals that nothing in the quotation can legitimately be construed as saying that there can be "Federal action" without an "overt act." In the deleted material, the court gave instances of the kind of federal approval of a non-federal project which constitutes "Federal action." The second sentence of the above quotation reads in full:

> NEPA's impact statement procedure has been held to apply where a federal agency approves a lease of land to private parties, grants licenses and permits to private parties, or approves and funds state highway projects.

*SIPI*, 156 U.S.App.D.C. at 404, 481 F.2d at 1088 (footnotes omitted).

Appellees seek, but we believe fail to find, support not only from the language, but also from the holding in *SIPI*. The issue in that case was whether the Atomic Energy Commission had to issue an impact statement for a Liquid Metal Fast Breeder Reactor program which had been begun many years before and was expected to continue for many years after we decided the case. The Commission argued that it needed only to prepare impact statements for individual test facilities, but we held

that a statement was also needed for the whole program. While it is true, as appellees note, that private companies participated in and expected to benefit from the program, frequent federal reports, the participation of numerous government employees, and the expenditure of hundreds of millions of federal dollars were "overt acts" in plenty.

In their effort to show that *any* federal acquiescence in another party's project constitutes "Federal action," appellees cite us to Professor Rodgers' treatise:

> [T]he distinguishing feature of "federal" involvement is the ability to influence or control the outcome in material respects. The EIS process is supposed to inform the decisionmaker. This presupposes he has judgment to exercise. Cases finding "federal" action emphasize authority to exercise discretion over the outcome.

Appellees' Brief at 27, *quoting* W. Rodgers, Environmental Law 763 (1977). The ability to influence the outcome of the project is certainly a necessary condition of "Federal action," but it is not a sufficient condition, as a look at the passage of the treatise which precedes the passage quoted above makes clear. There, Professor Rodgers catalogues the kind of

> sanctioning of private, state or local activity [which] could constitute "major federal action." Thus, federal license, permits, leases, loans, grants, insurance, contracts, contract extensions and modifications, conveyances, assistance authorizations, approvals of right-of-ways, or filings in appropriate cases may require preparation of an impact statement although the federal presence is minimal.

*Id.* at 761–62 (footnotes omitted). In none of these instances is the agency wholly passive; in all of them there is an "overt act."

### C

Our somewhat exact reading of section 102(2)(C) and our insistence on an "overt act" may seem literal and formalistic. But our approach is not only consonant with, but is commanded by, the principles and spirit of NEPA. This court has had occasion before to rule on requests that environmental impact statements be required be-

yond the bounds of the possible. In *Sierra Club v. Andrus,* 189 U.S.App.D.C. 117, 581 F.2d 895 (1978), we were asked to require the Department of the Interior to prepare statements to accompany appropriation requests for all programs having significant environmental consequences. We declined to do so except "when the request for budget approval and appropriations is one that ushers in a considered programmatic course following a programmatic review." *Id.* 189 U.S.App.D.C. at 125, 581 F.2d at 903. What we said then bears repeating in some detail now:

> Plaintiffs' logic-based contention . . leads logically to the conclusion that an EIS would have to accompany every budget request for the annual operation of an environmental-conservation program, or indeed of an agency whose activities may have significant environmental impact. The principle of *reductio ad absurdum* is part of the landscape of logic. Plaintiffs have not suggested a limiting principle to their logic.

> . . .   . . . There is a danger of overburdening NEPA by spreading its mandate too widely. The environmental analysis required by NEPA is governed by the rule of reason, as we have held in determining the scope of realistic alternatives to the proposed action and the intensity of the required analysis. A rule requiring preparation of an EIS on the annual budget request for virtually every ongoing program would trivialize NEPA. . .

> NEPA has been salutary in heightening agency attention to environmental values, in part by requiring disclosure of environmental consequences. However, we cannot allow NEPA to be bloated, and indeed enfeebled, by pushing the logic of Section 102(2)(C) to ridiculous extremes. NEPA does not require an annual EIS on routine operation and maintenance of every program with significant environ-·

mental ramifications. Its rule of reason does not demand rethinking of everything all the time.

*Id.* 189 U.S.App.D.C. at 124, 125, 128, 581 F.2d at 902, 903, 906 (footnotes omitted). On appeal, in a unanimous opinion, the Supreme Court not only cited approvingly from the first two paragraphs quoted above; it carried our reasoning a step further by reversing that portion of our decision which said that appropriation requests do need to be accompanied by impact statements in the special circumstances we specified.[5]  *Andrus v. Sierra Club,* 99 S.Ct. 2335 (1979).

NEPA would be impaired in the manner of which we warned in *Sierra Club v. Andrus* were we now to decide for appellees. No agency could meet its NEPA obligations if it had to prepare an environmental impact statement every time the agency had power to act but did not do so. Nor does it suffice to say that an agency's burden would be kept to a reasonable level by the fact that no impact statement is needed when the inaction could have no significant environmental results, for we have held that an agency which decides not to issue an impact statement must provide a written explanation of its reasons for that decision. *See, e. g., SIPI,* 481 F.2d at 1094. This requirement is necessary to ensure that the agency's decision is well-considered and to provide a basis for the judicial review of the agency's decision. It would be an imaginative and vigorous agency indeed which could identify and prepare all the statements and explanations appellees' reading of NEPA would have the statute demand.

In a letter to the Department of Justice, the General Counsel of the Council on Environmental Quality (CEQ)—the agency established in part to oversee the implementation of NEPA—recognized that an over-expansive interpretation of section 102(2)(C) could create

> a serious administrative burden on Federal agencies. There are literally thousands of decisions which Federal officials

---

**5.** The Court's holding rested only in part on the reasoning described in the quotations from our opinion in *Sierra Club v. Andrus.*

are authorized to and could conceivably make under existing law. If the mere existence of this authority was a basis for invoking NEPA—regardless of whether a Federal decision was required to be or had been made—the scope of the environmental review process would be vastly expanded.[6]

We have said, and we still believe, that "[c]onsiderations of administrative difficulty, delay or economic cost will not suffice to strip the section of its fundamental importance." *Calvert Cliffs' Coordinating Com-* *mittee v. Atomic Energy Commission,* 149 U.S.App.D.C. 33, 39, 449 F.2d 1109, 1115 (1971). But the obligation appellees would have us impose goes beyond the difficult and well into the impossible. Neither NEPA's language, nor the precedent interpreting it, nor the public policy behind it, requires us to reach that result.

## V

### *The Relationship of NEPA and FLPMA*

The District Court and appellees believe that the above analysis of the Secretary's

---

**6.** This letter was originally submitted to us as an attachment to a joint memorandum submitted after oral argument when our Court considered its first case styled *Defenders of Wildlife v. Andrus. See* Part II of this opinion. It is referred to in the record and was resubmitted to us as an attachment to appellants' Reply Brief. It was written January 10, 1979, by Mr. Nicholas Yost, General Counsel of the Council on Environmental Quality, in response to a request of the Department of Justice (which was at the time representing the Secretary and his co-defendants) that the CEQ express its views as to whether section 1508.18 of the CEQ's new regulations would require the Department of the Interior to prepare an environmental impact statement under the facts of that case. Since the circumstances and parties of that case and the case now before us are for these purposes virtually indistinguishable, and since "CEQ's interpretation of NEPA is entitled to substantial deference," *Andrus v. Sierra Club,* 99 S.Ct. 2335, 2341 (1979), a brief discussion of the letter may be useful.

The new "Regulations for the Implementation of the Procedural Provisions of the National Environmental Policy Act" which prompted the letter appear in 43 Fed.Reg. 55978 *et seq.* (November 29, 1978). They became mandatory on July 30, 1979—after the appeal in this case reached our court, though section 1506.12 of the regulations states: "These regulations shall apply to the fullest extent practicable to on-going activities and environmental documents begun before the effective date." *Id.* at 56002. Section 1508.18 of those regulations reads:

"Major Federal action" includes actions with effects that may be major and which are potentially subject to Federal control and responsibility. . . . Actions include the circumstance where the responsible officials fail to act and that failure to act is reviewable by courts or administrative tribunals under the Administrative Procedure Act or other applicable law as agency action.

*Id.* at 56004.

Mr. Yost's letter first noted that the regulations had not yet taken effect. The letter next stated its understanding that this was a case in which no federal decision was required to be made and in which no federal decision had been made. The letter then enunciated the principle that

[a]n EIS need not be prepared . . . where no Federal decisions are required and none have been made. Without a Federal decision—whether that decision be to act or to refrain from acting—there can be no "major Federal action" under NEPA

The letter proceeded to compare that principle with the CEQ's new regulations:

Section 1508.18 of the NEPA regulations is consistent with this principle. The reference in that Section to "a failure to act" was not intended by the Council to require the preparation of an EIS where no Federal decision was required and none had been made. The phrase "failure to act" was intended rather to describe one possible outcome in those situations where a Federal decision had been or was required to be made.

We recognize that the practical effect of a decision not to act and no decision at all is the same in the circumstances of this case. In both cases, State activities on Federal lands may proceed.

At some level, of course, an agency cannot avoid "deciding" whether to act when, as here, it has been asked to act and has declined to do so. That is the point of the cliché that "not to decide is to decide." However, as to the case before us, the CEQ and we seem to be in essential agreement. First, we understand appellees to be saying that the Secretary has not "decided," and our discussion in Part V of this opinion of NEPA's allocation of responsibilities between the states and the Secretary indicates that the Secretary was not compelled to "decide" in any useful sense of that word. Second, the CEQ and we are making the same point: that "[a] primary goal of the Council's regulations is to provide practical and realistic parameters for the environmental review process," and that a requirement that an agency write an impact statement every time it does not exercise its power to act is not such a "parameter."

duty under NEPA is insufficient. They reason that FLPMA imposes such supervisory duties on the Secretary that every failure to prohibit a state wildlife program which is carried out on Federal land and which may have significant environmental consequences must be accounted for with an impact statement. The District Court decided

> that the Secretary has a nondiscretionary duty to plan for and manage federal land and resources. In view of this responsibility, the Secretary must prohibit any major actions significantly affecting the human environment from occurring on federal lands until an environmental impact statement has been prepared and circulated. Accordingly, until an EIS has been prepared, the Secretary must take appropriate action to prevent aerial wolf killing on federal lands by the State of Alaska and its agents.

Mem. Op. at 5.

FLPMA, which is also referred to as the Bureau of Land Management Organic Statute, was enacted "to provide the first comprehensive, statutory statement of purposes, goals, and authority for the use and management of about 448 million acres of federally-owned lands administered by the Secretary of the Interior through the Bureau of Land Management." S.Rep.No.94–583, 94th Cong., 1st Sess. 24 (1975). As such, it certainly imposes on the Secretary a general duty "to plan for and manage federal land and resources." However, the District Court's reasoning seems to us to upset an allocation of functions Congress carefully and explicitly made in FLPMA, for Congress there assigned the states the primary responsibility for the management of wildlife programs within their boundaries.

It is unquestioned that "the States have broad trustee and police powers over wild animals within their jurisdictions," *Kleppe v. New Mexico,* 426 U.S. 529, 545, 96 S.Ct. 2285, 2294, 49 L.Ed.2d 34 (1976). Neither is

it questioned that, because the Property Clause of the Constitution provides that "Congress shall have Power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States," U.S.Const., Art. IV, § 3, cl. 2, Congress may, if it wishes, pre-empt state management of wildlife on federal lands. *Kleppe v. New Mexico,* 426 U.S. at 539–41, 96 S.Ct. at 2291–2292. Despite its ability to take control into its own hands, Congress has traditionally allotted the authority to manage wildlife to the states. For instance, in the Multiple Use-Sustained Yield Act of 1960, Congress declared:

> It is the policy of the Congress that the national forests are established and shall be administered for outdoor recreation, range, timber, watershed, and wildlife and fish purposes. . . . Nothing herein shall be construed as affecting the jurisdiction or responsibilities of the several States with respect to wildlife and fish on the national forests. . . .

16 U.S.C. § 528.

Even in writing specifically "environmental" legislation, Congress has adhered to that allocation. Thus, Congress stated in the National Wildlife Refuge System Administration Act,

> The Provisions of this Act shall not be construed as affecting the authority, jurisdiction, or responsibility of the several States to manage, control, or regulate fish and resident wildlife under State law or regulations in any area within the System.

16 U.S.C. § 668dd(c). Similarly, the Wild and Scenic Rivers Act provides that

> [n]othing in this chapter shall affect the jurisdiction or responsibilities of the States with respect to fish and wildlife.

16 U.S.C. § 1284(a).[7]

Far from attempting to alter the traditional division of authority over wildlife

---

**7.** When Congress has wished to change this traditional allocation of tasks, it has done so self-consciously and precisely, as the Endangered Species Act of 1973, 16 U.S.C. § 1531 *et*

*seq.,* demonstrates. The House Committee responsible for the bill carefully noted that coherent national and international policies were needed adequately to protect endangered spe-

management, FLPMA broadly and explicitly reaffirms it. Section 302(b) of FLPMA begins by directing that the Secretary shall regulate "the use, occupancy, and development of the public lands." After a proviso relating to the use of lands by federal agencies, section 302(b) continues:

> *Provided further,* That *nothing in this Act* shall be construed as authorizing the Secretary concerned to require Federal permits to hunt and fish on public lands or on lands in the National Forest System and adjacent waters *or as enlarging or diminishing the responsibility and authority of the States for management of fish and resident wildlife.* However, the Sec-

retary concerned *may* designate areas of public land and of lands in the National Forest System where, and establish periods when, no hunting or fishing will be permitted for reasons of public safety, administration, or compliance with provisions of applicable law. Except in emergencies, any regulations of the Secretary concerned relating to hunting and fishing pursuant to this section shall be put into effect only after consultation with the appropriate State fish and game department.

43 U.S.C. § 1732(b) (emphasis added.) [8]

The first quoted sentence of section 302(b) self-evidently places the "responsibil-

cies. H.Rep.No.93–412, 93d Cong., 2d Sess. 7 (1973). In the Act itself, Congress specifically provided:

> Any State law or regulation which applies with respect to the importation or exportation of, or interstate or foreign commerce in, endangered species or threatened species is void to the extent that it may effectively (1) permit what is prohibited by this chapter or by any regulation which implements this chapter, or (2) prohibit what is authorized pursuant to an exemption or permit provided for in this chapter or in any regulation which implements this chapter. This chapter shall not otherwise be construed to void any State law or regulation which is intended to conserve migratory, resident, or introduced fish or wildlife, or to permit or prohibit sale of such fish or wildlife.

16 U.S.C. § 1535(f). Even in this Act, however, the House Committee report continued the comments quoted above by reaffirming the importance of state management of wildlife:

> [T]he states are far better equipped to handle the problems of day-to-day management and enforcement of laws and regulations for the protection of endangered species than is the Federal government. It is true, and indeed desirable, that there are more fish and game enforcement agents in the state system than there are in the Federal government.

H.Rep.No.93–412, 93d Cong., 1st Sess. 7 (1973).

8. A glance at the legislative history confirms what is plain enough on the face of the statute—Congress intended that the primary responsibility for wildlife management would lie with the states. The Committee report on the House version of the bill explained that the bill

> provides that hunting and fishing will be permitted in accordance with Federal and State laws and that no Federal permits for hunting or fishing are authorized by this section. It permits the Secretaries to close areas to hunting and fishing for reasons of public

safety. The Secretaries are expected to use the authority granted by the bill to close areas only if essential to the public safety, and then only for the shortest periods needed to accomplish this purpose. Protection of the public safety includes prevention and avoidance of hazards to persons, animals, and property.

H.Rep.No.94–1163, 94th Cong., 2d Sess. 6 (1976), U.S.Code Cong. & Admin.News 1976, pp. 6175, 6180. The Conference Report makes the point even more clearly.

> The conferees authorize the two Bureaus to ban hunting and fishing for reasons of public safety, administration, and compliance with applicable law. The word "administration" authorizes exclusion of hunting and fishing from an area in order to maintain supervision. It does not authorize exclusions simply because hunting and fishing would interfere with resource-management goals.

H.Rep.No.94–1724, 94th Cong., 2d Sess. 60 (1976), U.S.Code Cong. & Admin.News 1976, p. 6231.

We should note that the Conference Report probably overstates its case. Senator Metcalf, Chairman of the Conference Committee, explained that "in attempting to define the term 'administration,' the statement of managers confuses the issue and could be wrongly interpreted to prevent the Secretary from protecting the public lands." 122 Cong.Rec. S17668 (daily ed. Oct. 1, 1976). Likewise, in the House, Representative Melcher, Chairman of the Subcommittee of the House Interior Committee which handled the bill, engaged in a discussion with Representative Seiberling which suggested that "administration" is not to be quite so restrictively defined, as the following excerpt indicates:

> MR. SEIBERLING. Therefore, I take it that the gentleman would agree that the BLM and the Forest Service could close lands under their jurisdiction to hunting and fishing

ity and authority" for state wildlife management precisely where Congress has traditionally placed it—in the hands of the states. The second quoted sentence of the section arguably permits ("may"), but certainly does not require ("shall"), the Secretary to supersede a state program,[9] and even when he does so, it must be after consulting state authorities. We are simply unable to read this cautious and limited permission to intervene in an area of state responsibility and authority as imposing such supervisory duties on the Secretary that each state action he fails to prevent becomes a "Federal action." A state wildlife-management agency which must seek federal approval for each program it initiates can hardly be said to have "responsibility and authority" for its own affairs.

Appellees remind us that FLPMA directs the Secretary to "manage the public lands under principles of multiple use and sustained yield," 43 U.S.C. § 1732(a), and that

> "multiple use" means . . . a combination of balanced and diverse resource uses that takes into account the long-term needs of future generations for renewable and nonrenewable resources, including, but not limited to, recreation, range, timber, minerals, watershed, wildlife and fish, and natural scenic, scientific and historical values . . . .

43 U.S.C. § 1702(c). Appellees also remind us that, pursuant to his authority under FLPMA, 43 U.S.C. § 1714(e), the Secretary has ordered that some of the lands on which wolves are to be killed

> are withdrawn from settlement, sale, location, entry or selection under the operation of the public land laws, including but not limited to the mining laws . . . and are reserved and appropriated for the public purpose of preserving, protecting, and maintaining the resource values of said lands which would otherwise be lost . . . .

43 Fed.Reg. 59756 (December 21, 1978).

■ Nevertheless, the statutory provisions of which appellees remind us are all part of FLPMA. Section 302(b) of that Act expressly commands that "nothing in this Act" enlarges or diminishes the state's responsibility for managing wildlife. We are therefore unable to conclude that appellees' citations to FLPMA should alter our understanding of the Secretary's obligation to prepare an environmental impact statement when he declines to exercise the power which FLPMA arguably gives him to preempt state wildlife-management programs.[10]

The order of the District Court granting a preliminary injunction is reversed.

*It is so ordered.*

---

for reasons related to the management of the wildlife habitat?

MR. MELCHER. Yes, I would agree to that, but we do expect to cooperate in all instances possible with the State Fish and Game Commissions to allow those authorities to set hunting seasons and to set requirements for hunting and fishing.

122 Cong.Rec. H12009 (daily ed. Sept. 30, 1976).

**9.** Several parties in these "wolf hunt" cases have urged that the Secretary has no such power. At one point, the Secretary himself was among these, though he later withdrew that contention. *See* note 3 *supra*. The State of Alaska brought *Alaska v. Andrus* to establish that proposition, and in this court's first *Defenders of Wildlife v. Andrus*, the International Association of Fish and Wildlife Agencies filed a brief *amicus* to the same effect. *See* Part II, *supra*. Some of the legislative history which gives force to the argument of these parties is cited in note 8 *supra*.

**10.** It is possible to read appellees' complaint as alleging that the Secretary has violated duties under FLPMA quite apart from FLPMA's effect on his obligation to prepare an environmental impact statement. However, we do not understand the District Court to have done more than instruct the Secretary to halt the killing of wolves until he has prepared an environmental impact statement. Therefore, although our discussion of FLPMA has necessarily touched on the limited nature of the Secretary's obligations under the Act, we do not otherwise reach the question of whether he has violated it.