Eric RINGSRED, an
individual, Appellant,

and

State of Minnesota, by Eric Ringsred,

v.

The CITY OF DULUTH, A MINNESOTA
HOME-RULE CHARTER CITY; The
Bureau of Indian Affairs; Kenneth L.
Smith, Assistant Secretary of the Inte-
rior—Indian Affairs; The United States
Dept. of Interior and Donald Hodel,
Secretary of the Interior, Appellees.

No. 87–5124.

United States Court of Appeals,
Eighth Circuit.

Submitted June 8, 1987.

Decided Sept. 14, 1987.

Paul Engh, Minneapolis, Minn., for appellant.

Maria A. Itzuka, Washington, D.C., for The City of Duluth.

Steven C. Overom, Duluth, Minn., for intervenor—Duluth—Fond du Lac Economic Development Com'n.

Before LAY, Chief Judge, McMILLIAN and JOHN R. GIBSON, Circuit Judges.

JOHN R. GIBSON, Circuit Judge.

Eric Ringsred appeals from an adverse summary judgment and argues that a parking ramp in downtown Duluth, Minnesota cannot be constructed until the effects of this project on the environment and on historic properties are more formally considered. As jointly proposed by the Fond du Lac Band of Lake Superior Chippewa ("the Band") and the City of Duluth, this parking ramp will abut a bingo facility currently operated by a commission composed of Band and City representatives in a building on Indian reservation land. For the reasons discussed below, we affirm the district court's[1] judgment.

In reviewing this grant of summary judgment, we state the facts in the light most favorable to Ringsred and give him the benefit of all reasonable inferences that can be drawn from these facts. *E.g., Poolman v. Nelson*, 802 F.2d 304, 306 (8th Cir.1986).

In 1984 the Band and the City of Duluth created the Duluth-Fond du Lac Economic Development Commission, a political subdivision of the Band that would develop and operate a gaming facility in the former Sears Building in Duluth. The Band purchased the building, which was then transferred to the United States to be held in trust for the Band under 25 U.S.C. § 465 (1982), and made part of the Band reservation pursuant to 25 U.S.C. § 467 (1982). The Band then obtained a $3.5 million loan to remodel the building and equip the gaming facility. After the renovation, the Band leased the facility to the Commission. In April 1986, the Secretary approved this lease as required by 25 U.S.C. § 415 (1982 & Supp. III 1985) and certain other agreements pursuant to 25 U.S.C. § 81 (1982), and on September 2, 1986, the Commission opened the gaming facility for business.

In exchange for the Band's agreement to remodel the building and equip the gaming facility, the City agreed to acquire land next to the gaming facility and construct a municipal parking ramp that would be leased to the Commission for its non-exclusive use. On July 23, 1986, the City issued bonds totaling $3 million to finance the project and began condemnation proceedings on the property next to the Sears building. The order giving the City possession of the property was issued on November 20, 1986. Questions concerning the propriety of the condemnation proceeding and the validity of this order were litigated through the Minnesota state courts and have been finally resolved in the City's favor. *See City of Duluth v. Alexander*, 404 N.W.2d 24 (Minn.Ct.App.1987), *review denied* (Minn. May 20, 1987). The land is now owned by the City; it is not and will not be a part of the land held in trust by the United States for the Band.

---

1. The Honorable Robert G. Renner, United States District Judge for the District of Minnesota.

Before the United States took the Sears building in trust, the Secretary issued an Environmental Assessment, which reviewed the proposed trust acquisition and development of the gaming facility, but did not consider the environmental effects of or alternatives to the proposed parking ramp construction. The Environmental Assessment concluded that development of the gaming facility would have beneficial social and economic effects and would not adversely affect the environment.

In October 1984, Ringsred brought the present action seeking declaratory relief and an injunction prohibiting the construction of the parking ramp. To the extent relevant to this appeal, Ringsred's amended complaint alleged that the Secretary acted without properly considering the effects of the proposed parking ramp construction on the environment and on historic buildings in violation of the National Environmental Policy Act ("NEPA"), see 42 U.S.C. § 4332 (1982), and the National Historic Preservation Act ("NHPA"), see 16 U.S.C. § 470f (1982), respectively. He also alleged that the Secretary acted unlawfully in approving an Indian/non-Indian partnership that confers sovereign rights and immunities on non-Indians. After hearing oral argument on the defendants' motion to dismiss, the district court dismissed these claims. This expedited appeal followed.[2]

In reviewing the district court's grant of summary judgment, we apply the same standard as the district court. *Poolman v. Nelson*, 802 F.2d at 307. Summary judgment is proper only when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Id.;* Fed.R.Civ.P. 56(c).

We first consider Ringsred's contention that the Secretary violated NEPA. 42 U.S.C. § 4332(2)(C) requires federal agencies to file an environmental impact statement ("EIS") for "major Federal actions significantly affecting the quality of the human environment." An EIS must consider, among other things, "any adverse

environmental effects which cannot be avoided should the proposal be implemented," and "alternatives to the proposed action." 42 U.S.C. § 4332(2)(C)(ii) & (iii). The agency makes the initial determination whether its contemplated action will have a significant environmental impact. *Olmsted Citizens for a Better Community v. United States*, 793 F.2d 201, 204 (8th Cir. 1986). If the challenger to a negative determination shows that the agency failed to consider a substantial environmental issue, the negative determination will be upheld only if the agency can show that its decision was reasonable. *Id.*

The Secretary's Environmental Assessment concluded that his actions with respect to the Sears building would not have a significant environmental impact. Ringsred does not dispute that an Environmental Assessment is a valuable screening device that allows agencies with limited resources to focus on truly important federal actions. *See, e.g., Preservation Coalition, Inc. v. Pierce*, 667 F.2d 851, 858 (9th Cir.1982); *Defenders of Wildlife v. Andrus*, 627 F.2d 1238, 1245–47 (D.C.Cir. 1980). He argues, however, that the Environmental Assessment was deficient in that it failed to consider the environmental impact of and alternatives to the proposed parking ramp construction. He contends that such considerations were required for three reasons: (1) the proposed parking ramp construction is itself part of a major federal action; (2) even if the proposed parking ramp construction is not part of a major federal action, its environmental impact should have been considered as a secondary effect of the Secretary's actions with respect to the Sears building; and (3) 42 U.S.C. § 4332(2)(C)(ii) required consideration of the "adverse environmental effects" of the proposed parking ramp construction.

Before addressing these arguments, we observe that the Secretary took the following actions with respect to the gaming facility and the proposed parking ramp con-

struction: (1) He took the Sears building in trust and proclaimed it an Indian reservation, 25 U.S.C. §§ 465, 467; (2) he approved the lease of the Sears building to the Commission, 25 U.S.C. § 415; and (3) he approved certain contracts [3] between the Band and the City, 25 U.S.C. § 81. Of these actions, the only ones that relate to the proposed parking ramp are those where the Secretary approved a contract concerning the parking ramp.

■ We first conclude that the Secretary's actions relating to the parking ramp project were so incidental that the project does not constitute part of a major federal action. No federal action is a legal condition precedent to the construction of the parking ramp. *See Winnebago Tribe of Nebraska v. Ray*, 621 F.2d 269, 272 (8th Cir.) (must consider entire nonfederal project when federal action is legal condition precedent to accomplishment of it), *cert. denied*, 449 U.S. 836, 101 S.Ct. 110, 66 L.Ed.2d 43 (1980). The City itself could exercise its condemnation powers and construct the parking ramp without federal approval or assistance. Furthermore, while the Secretary's actions relating to the parking ramp project (i.e., the approval of contracts) did give him a factual veto power, these actions were not significant enough to establish a major federal action. Three factors must be considered to decide whether this factual control required consideration of the environmental effects of the parking ramp project: "(1) the degree of discretion exercised by the agency over the federal portion of the project; (2) whether the federal government has given any direct financial aid to the project; and (3) whether 'the overall federal involvement with the project [is] sufficient to turn essentially private action into federal action.'" *Id.* (citing *NAACP v. Medical Center, Inc.*, 584 F.2d 619, 629 (3d Cir.1978)).

In approving Indian contracts under 25 U.S.C. § 81, the Secretary's responsibility is "to protect the Indians from improvident and unconscionable contracts." *In re Sanborn*, 148 U.S. 222, 227, 13 S.Ct. 577, 579, 37 L.Ed. 429 (1893). The Bureau of Indian Affairs official who approved the contracts between the Band and the City, stated in an affidavit before the district court that "[s]uch review and approval by the Bureau of Indian Affairs is routinely requested by, and provided to federally-recognized Indian tribes, even in instances where, like the Parking Ramp agreement, the Bureau of Indian Affairs does not consider such approval necessary." App. 93. Beyond this approval, the Secretary has no role in or control over the construction of the parking ramp. The federal government provides no financial aid to the project and will receive no revenue from it. The land is owned by the City of Duluth. The parking ramp is not subject to any federal licensing. And the federal government has no input regarding the design or construction of the parking ramp. We thus conclude that the Secretary's approval of contracts relating to the parking ramp project did not transform the project into part of a major federal action whose environmental effects should have been considered in an Environmental Assessment. *Cf. Save Our Wetlands, Inc. v. Sands*, 711 F.2d 634, 644 n. 9 (5th Cir.1983) ("A private act does not become a federal act, albeit a 'major' one, merely because of some incidental federal involvement."); *Save the Bay, Inc. v. United States Corps of Eng'rs*, 610 F.2d 322, 326–27 (5th Cir.) (same), *cert. denied*, 449 U.S. 900, 101 S.Ct. 269, 60 L.Ed.2d 130 (1980)).

■ We are also convinced that the Environmental Assessment need not have considered the parking ramp as a secondary or indirect impact of the contemplated action

---

**3.** The agreements approved by the Secretary included a "Commission agreement," which authorizes the Commission to run the gaming facility and provides that 25.5 percent of gaming profits will be distributed to the Band, 24.5 percent to the City and 50 percent to the Commission; a "guarantee agreement," which states that bonds issued for the parking ramp will be paid and completely guaranteed by the Band and the Commission; a "parking lease agreement," which establishes rent and operational parameters for the parking ramp; and a "development agreement," which outlines the development commitments of the parties and references all agreements to a single document.

concerning the Sears building. In *Winnebago Tribe*, we rejected the argument that in approving a segment of a proposed power line, the Army Corps of Engineers had to consider the environmental impacts of the entire proposed nonfederal project. 621 F.2d at 273. Like the situation in *Winnebago Tribe*, the parking ramp project is a nonfederal project that, at the time the Environmental Assessment was considered, was only in the proposal stage. A requirement that every Environmental Assessment must speculate as to the environmental effects of privately proposed developments that are outside the control of the federal government would create burdens in the Environmental Assessment "screening process" that are equally significant to those placed on an agency required to file an EIS. *Cf. Defenders of Wildlife v. Andrus*, 627 F.2d at 1245–47. We therefore cannot conclude that the Secretary was required to consider as an indirect impact the environmental effects of the proposed parking ramp construction.

■ Ringsred's final NEPA argument is that the impact of the proposed parking ramp construction constitutes "adverse environmental effects" that should have been considered pursuant to 42 U.S.C. § 4332(2)(C)(ii). This argument presupposes, however, that the Secretary had an obligation to file an EIS considering such information. We think the Secretary reasonably concluded that the development of the Sears building as a gaming facility would not significantly affect the environment. Therefore, there were no "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). Because the Secretary reasonably concluded that he was not sub-ject to the EIS requirement, we reject Ringsred's final NEPA argument.

■ Ringsred next contends that the Secretary violated NHPA by failing to consider the effect of the parking ramp project on historic properties eligible for inclusion in the National Register. *See* 16 U.S.C. § 470f. Section 470f is triggered when there exists a "Federal or federally assisted undertaking." *Id.* The parties treat NHPA's "undertaking" requirement as essentially coterminous with NEPA's "major Federal actions" requirement. *See, e.g., United States v. 162.20 Acres of Land*, 639 F.2d 299, 304 n. 5 (5th Cir.), *cert. denied*, 454 U.S. 828, 102 S.Ct. 120, 70 L.Ed.2d 103 (1981). Accordingly, based on our above discussion of the lack of federal involvement with the parking ramp project, we conclude that the project is not an "undertaking" and thus falls outside the scope of NHPA.

■ Finally, Ringsred contends that in approving contracts that authorized the Commission to operate the gaming facility, the Secretary unlawfully conferred Indian sovereign rights and immunities on the City.[4] As specifically pleaded in Ringsred's seventh cause of action, the foundation for this argument is that the gambling being conducted at the Sears building, which is on Indian reservation land, is in violation of Minnesota's gambling laws. In *California v. Cabazon Band of Mission Indians*, —— U.S. ——, 107 S.Ct. 1083, 94 L.Ed.2d 244 (1987), the Supreme Court recently held that a state's regulatory, as opposed to prohibitory, gambling laws are not applicable to gambling operations on Indian reservations. Minne-

---

**4.** We have serious doubts as to whether Ringsred has standing to assert this claim. *Cf. City of Duluth v. Alexander*, 404 N.W.2d at 26 n. 2 (expressing doubts as to whether Alexander, a property owner challenging the condemnation of land for the parking ramp, had standing to litigate whether the use of the gambling facility is unlawful). Ringsred's asserted threatened injury is that if the proposed parking ramp is constructed the environment will be harmed and historic properties in which he has a financial interest will be destroyed. Among other requirements, Article III of the Constitution re-quires that the party who invokes a court's authority must show that his claimed actual or threatened injury "is likely to be redressed by a favorable decision." *Simon v. Eastern Ky. Welfare Rights Org.*, 426 U.S. 26, 38, 96 S.Ct. 1917, 1924, 48 L.Ed.2d 450 (1976). Even if we accepted Ringsred's argument that, under the present agreements, the City could not participate in the operation of the gaming facility, *City of Duluth* recognized the need for additional parking in the area other than related to the gambling facility.

sota's Bingo gambling laws are solely regulatory. *See* Minn.Stat.Ann. § 349.11 (West Supp.1987) (purpose of Bingo gambling laws is to "regulate" such gambling). Like the present situation, the gambling operations in *Cabazon* were conducted on Indian reservation land and were managed by Indians and non-Indians. *See* 107 S.Ct. at 1097–98 n. 2 (Stevens, J., dissenting). In recognition of the fact that important tribal interests outweighed the interests embodied in state regulatory laws, the Court rejected the argument that the Tribes were simply marketing an exemption from state gambling laws. *Id.* at 1093–94; *see also New Mexico v. Mescalero Apache Tribe,* 462 U.S. 324, 103 S.Ct. 2378, 76 L.Ed.2d 611 (1983). We are similarly unpersuaded that the Band's relationship with the City is unlawful. The Band is lawfully "generating value on the reservation[ ] through activities in which [it has] a substantial interest." 107 S.Ct. at 1094. We thus reject Ringsred's argument that the gaming facility is being operated in an unlawful manner. *See City of Duluth v. Alexander,* 404 N.W.2d at 26–27 (rejecting similar argument).

The judgment of the district court is affirmed.