NATIONAL TRUST FOR HISTORIC PRESERVATION and Save Our Seminary At Forest Glen, Plaintiffs,

v.

Major General Ronald R. BLANCK, et al., Defendants.

Civil Action No. 94–1091 (PLF).

United States District Court, District of Columbia.

Sept. 13, 1996.

Richard B. Nettler and Lynn Perry Parker, Robins, Kaplan, Miller & Ciresi, Washington, DC and Andrea C. Ferster, Washington, DC, for plaintiffs.

Darya Geetter, Assistant United States Attorney, Washington, DC, for defendants.

## OPINION

FRIEDMAN, District Judge.

This case concerns the extent of the federal government's obligation to spend scarce funds to preserve historic buildings under the National Historic Preservation Act ("NHPA"), 16 U.S.C. § 470 *et seq.* Plaintiffs, the National Trust for Historic Preservation and Save Our Seminary at Forest Glen, seek declaratory and injunctive relief to compel the Army to expend substantial sums of money in long-term preservation activities that, plaintiffs argue, are not only necessary to preserve the National Park Seminary Historic District, a community of historic buildings located at the Walter Reed Army Medical Center, but are statutorily mandated. The government asserts that it has in fact expended significant resources in order to preserve the Historic District consistent with the Department of the Army's spending priorities and mission, that it has complied with the requirements of the NHPA, and that the Act does not contemplate the kind of relief plaintiffs seek.

Both sides moved for summary judgment, and plaintiffs subsequently filed a motion for a preliminary injunction, supplemented by affidavits, photographs and other evidence of deterioration, to force the Army to undertake emergency repairs and stabilization measures to the historic buildings in the Historic District in order to preserve the status quo during the pendency of this litigation. *See*

Pls.' Mot. for Temporary Restraining Order and Preliminary Injunction (Jan. 22, 1996) and Appendix A.[1]

In this case, the availability of preliminary injunctive relief turns on whether plaintiffs have demonstrated a likelihood of success on the merits entitling them to relief under the statute.[2] The Court will address plaintiffs' request for a preliminary injunction as a part of its discussion of the ultimate disposition of the case and what relief, if any, is appropriate.

## I. FACTUAL BACKGROUND

Walter Reed Army Medical Center ("Walter Reed" or "WRAMC") is a medical care, research and teaching facility; Forest Glen, one of three geographically separate sections of Walter Reed, is an auxiliary service, support and research area in Silver Spring, Maryland. The National Park Seminary Historic District consists of 29 buildings spread over 23 acres of the Forest Glen section. The Maryland Historical Trust determined that twenty-four of those buildings contribute individually to the historic character of the Historic District while five other buildings do not. Plaintiffs' Statement of Material Facts As to Which There is No Genuine Dispute ("Pls.' Statement of Material Facts") ¶ 7; Cultural Resource Management Plan ("CRMP") at IV–3, Pls.' Ex. 2, Administrative Record ("A.R.") at 947. Walter Reed currently uses some of the 24 historic buildings for administrative purposes. The majority of the buildings, however, are not used at all. Interim Stabilization Plan (Apr. 13, 1994), A.R. at 1713.

### A. The Buildings of the Historic District

The National Park Seminary Historic District has been listed in the National Register of Historic Places since 1972. Built in the 1880s, Ye Forest Inne is the oldest building in the District. It was originally constructed as a resort and now serves as the Main Building (Building 101) of the National Park Seminary. The Odeon Theater (Building 104) was constructed in 1901, the Gymnasium (Building 118) in 1907, Aloha House (Building 116) in 1898, and the Villa (Building 199) in 1907. The Pergola Bridge spanned the glen and connected the Villa to the Practice House (Building 112). See note 1, supra. In the late 1890s and early 1900s, eight eclectic sorority houses were built, each in a different architectural style, which also are among the 29 buildings in the Historic District. In addition, the District contains formal gardens, foot bridges, retaining walls, walkways, trails, garden ornaments and statuary. Pls.' Statement of Material Facts ¶¶ 8–13.

The parties agree that there has been significant damage to and deterioration of the buildings in the Historic District over the years, although they disagree about the extent of the damage and deterioration. At least the following facts are not in dispute. By 1989, Building 101, the largest building in the complex, showed some rotten wood joints, mortar loss and deterioration. Walter Reed Survey of Historical Buildings on the 26 Acre Forest Glen Historic District, Maryland ("1989 Survey") (April 1989), Pls.' Ex. 4, A.R. at 280–301.5, 1122–1193. The foundation walls of Senior House were badly deteriorated. The Pergola Bridge was "in a deteriorating condition and might well be considered unsafe. Maintenance [on the Bridge] has been stopped." A.R. at 1145. See also note 1, supra. Building 109 needed a new roof; Building 112 had water infiltration in all basement areas and serious wall

---

1. Plaintiffs filed a supplemental memorandum in support of their request for a preliminary injunction on May 22, 1996; they filed a second supplemental memorandum on July 5, 1996, and a third on August 5, 1996. In the second submission, plaintiffs advised the Court that on or about June 24, 1996, the Pergola Bridge had collapsed after a severe thunderstorm and now is totally destroyed. The Pergola Bridge was the last remaining historic bridge in the National Park Seminary Historic District. They reported that the Pergola Bridge was the second contributing structure in the Historic District to be completely destroyed by the Army's neglect of the property; the Odeon Theater had been destroyed by fire in September 1993. They assert that other buildings in the Historic District—most notably, the Gymnasium, the Main Building, the Castle and the Dining Hall—are also at risk.

2. Plaintiffs have persuaded the Court on the irreparable harm prong of the test for preliminary injunctive relief. See Sea Containers Ltd. v. Stena AB, 890 F.2d 1205, 1208 (D.C.Cir.1989).

damage; and Building 107 had a deteriorating structural condition. The Army subsequently reported in 1992 that the south wall of the dining room of Building 101 had partially collapsed and one of the columns in the west portico of the library wing had rotted and dropped eight to ten inches. CRMP at V-7, A.R. at 951.

In 1990, KFS Historic Preservation Group, a paid consultant, prepared a "Section 106 Report" for the Army Corps of Engineers. Pls.' Ex. 27, A.R. at 3077.[3] The report found that the structures of the Historic District had "suffered serious and in some instances irreversible damage from long-term deferred maintenance. Several buildings have been condemned ... [and] abandoned and are rapidly falling into ruinous condition." Id. at 31–32, A.R. at 3114–15. The report described a wide variety of damage and concluded that "[w]hile the appropriate mitigation measure would be to develop a Historic Preservation Plan, as specified by Army Regulation 420-40, at this time funds are not available for WRAMC to undertake such an action." Id. at 47, A.R. at 3132. The Army does not dispute that its failure to expend more resources to maintain the District caused at least some of the significant damage. See CRMP at V-6, A.R. at 950.

### B. Walter Reed's Efforts in the Historic District

Since acquiring the Historic District in 1942, the Army has made some efforts to account for and preserve the historic value of the buildings, primarily through the development of Master Plans and, in 1992, a Cultural Resource Management Plan.[4] In 1967, the Army prepared a Master Plan that proposed demolishing the old buildings and erecting new ones; this plan was approved by the Maryland National Capital Parks and Planning Commission ("MNCPPC"). A.R. at 2003. A 1972 revised Master Plan retained the demolition proposal. At that time, however, MNCPPC raised concerns about the historic value of the buildings, and the Army delayed demolition. A.R. at 3975, 3979. On July 10, 1972, the Maryland Historical Trust ("MHT") nominated the property for inclusion in the National Register of Historic Places and, on September 14, 1972, the National Park Seminary Historic District was officially entered in the Register. A.R. at 1564–73. Walter Reed developed a further Master Plan in 1977, which was approved by the National Capitol Planning Commission ("NCPC"). A.R. at 586, 601, 608, 618.

In 1979, the General Services Administration proposed that Walter Reed "excess" the Historic District. See Executive Order 11954 Real Property Survey (Jan. 10, 1978) at 3, Pls.' Ex. 13.[5] Walter Reed rejected that proposal, opting to retain the property, even while acknowledging that the buildings were underutilized at that time and that their fate was uncertain. U.S. Army Health Services Command Memorandum (July 6, 1979), Pls.' Ex. 14, A.R. at 4351; see also Unclassified Memorandum (Sept.1981), A.R. at 2222. In the ensuing years, however, Walter Reed apparently continued to consider declaring the property to be excess and selling it off in order to redirect maintenance funds toward its medical mission. See Letter from Colonel Gerald D. Allgood to Maryland State Historic Preservation Office (May 14, 1984), A.R. at 1574 ("From a monetary standpoint, the Walter Reed Facilities Engineer would like to be relieved from the responsibilities for these 19 [historic] buildings as they use a disproportionate amount of his limited operation and maintenance budget."); see also Installation Survey Report (Apr. 17, 1984), A.R. at 2131–77 (identifying potential areas of Forest Glen

---

**3.** The reference is to Section 106 of the National Historic Preservation Act, 16 U.S.C. § 470f.

**4.** According to the Army, "the expressed purpose of the master plan is to establish a plan for the orderly and comprehensive development of the installation to satisfy immediate as well as long-range mission requirements in the most efficient and economical manner." A.R. at 2545; see Defs.' Mot. at 10 n. 3. A Master Plan "typically addresses maintenance concerns and contains such things as Architectural Surveys, Stabilization and Maintenance Guidelines, and a Cultural Resource Management Plan." Defs.' Mot. at 21.

**5.** The Army has established procedures to decide when real property over which it has control is surplus to its needs and is no longer required and the various ways in which such surplus or excess property may be disposed of. See 32 C.F.R. §§ 644.326–644.329.

for sale). In 1984, however, the Army abandoned the idea of excessing the property "as a result of the limited monetary return and expected time required (8–12 years) to excess the property." Defs.' Statement of Facts Identified By Plaintiffs to Which There is A Genuine Issue ("Defs.' Statement of Facts in Dispute") at 1 ¶ 28; *see* Pls.' Statement of Material Facts ¶ 30; *see also* 1989 Survey at 3, A.R. at 287.

In 1989, the Army completed another survey of historic buildings in the District in compliance with its own historic preservation regulation, Army Regulation 420–40. 1989 Survey, A.R. at 287. The 1989 Survey noted that "[h]istoric preservation was not a consideration to the Army at this site" until Army Regulation 420–40 became effective in 1984. It further stated that the Army's mission at Walter Reed and historic preservation were "in conflict," and that the underutilization of the old buildings on the site put "these facilities on a lower priority for maintenance funds when competition for funding direct medical facilities is severe." *Id.*

In 1991, the Commander of Walter Reed, Major General Richard D. Cameron, again recommended that the Historic District be excessed. As part of his recommendation, Major General Cameron noted that "the current condition of the buildings to be excessed is deteriorating to the point that it is hazardous to life and property and cannot be repaired or maintained at our justifiable cost." Memorandum to Headquarters of the Department of the Army ("HQDA") from Major General Richard Cameron (April 26, 1991), Pls.' Ex. 28, A.R. at 316.

In 1991, Walter Reed consulted with the National Capital Planning Commission ("NCPC"), the Montgomery County Planning Board ("MCPB"), the Maryland Historical Trust and the Maryland State Historic Preservation Officer ("SHPO"). A new proposed Master Plan was submitted to the MCPB on September 12, 1991. At a meeting on October 15, 1991, the MCPB and the NCPC raised 19 items of concern about the Master Plan, seven of which directly concerned the Historic District. A.R. at 586–89. On April 30, 1992, the NCPC approved the proposed Master Plan, as modified, and specifically noted that certain concerns relating to historic preservation had been resolved. A.R. at 601, 608, 618. *See also* A.R. at 355 (letter from the MNCPPC reflecting cooperation with Walter Reed on Master Plan); A.R. at 1611–1618 (letter from the MNCPPC to Senator Paul Sarbanes dated September 22, 1993, stating that Walter Reed had "fully cooperated" with the MNCPPC). The 1992 Master Plan approved by the NCPC stated several times that the Historic District would be excessed. Master Plan Report (March 1992) ("1992 Master Plan") at ES–5, 12–2, Pls.' Ex. 6, A.R. at 697, 808.

As part of the 1992 Master Plan, KFS Historic Preservation Group prepared a report for the Army Corps of Engineers providing recommendations for stabilization and maintenance of the Historic District. These recommendations were adopted by Walter Reed as the "Forest Glen Section WRAMC Stabilization and Maintenance Guidelines" in accordance with the Secretary of the Interior's Standards for Rehabilitation Guidelines. Forest Glen Section WRAMC Stabilization and Maintenance Guidelines (Aug. 14, 1992), Pls.' Ex. 38, A.R. at 3836–50; *see* 36 C.F.R. pt. 68.[6] In December 1992, Army consultants prepared a "Roof Repair and Replacement Study," documenting damage to various roofs and windows and recommending immediate maintenance. Pls.' Ex. 36, A.R. at 3207. In October 1993, the Army commissioned a Stabilization Report from Ward Bucher to identify emergency stabilization measures. Pls.' Ex. 39, Attachment B.

The Army also commissioned a Cultural Resource Management Plan ("CRMP") in 1992. A.R. at 922. The Plan, prepared by KFS Historic Preservation Group, is dated August 14, 1992, but it was held out by the Army as having been formally adopted by Walter Reed as early as April 27, 1992. A.R. at 302, 305, 320. The Maryland Historical

---

**6.** Under the NHPA, the Secretary of the Interior is responsible for promulgating standards and guidelines governing the placement of properties in the National Register, professional standards for the preservation of federally owned or controlled properties, and federal agency responsibilities under the NHPA. 16 U.S.C. §§ 470a(a)(6), (a)(7), (b), (f), (g).

Trust never approved the CRMP, although the parties dispute the reason for the non-approval. *See* Letter from Maryland Historical Trust to Lt. Colonel Roy D. Quick (June 4, 1992), A.R. at 345 (describing the CRMP as "a comprehensive approach for the protection of the National Park Seminary" that "includes the necessary components as outlined in the Section 110 regulations" but raising several issues requiring resolution before the MHT would approve the plan). In the Section 106 Coordination documents, issued in April 1992, the Army described the CRMP as satisfying the requirements of Army Regulation 420–40 as well as Section 110 of the NHPA. A.R. at 305.[7]

On August 20, 1992, Walter Reed initiated formal consultations with the Advisory Council on Historic Preservation ("ACHP") under Section 106 of the NHPA with regard to the decision to excess the District. A.R. at 302–04, 312. A Cooperative Agreement between Walter Reed and Montgomery County was signed and a consulting firm was selected to perform an Alternative Use Study which was completed in May 1995. Declaration of Major General Ronald R. Blanck ("Blanck Decl.") ¶ 10 (July 8, 1996), Exhibit 1 to Defs.' Supp.Mem. (Aug. 5, 1996). Defendants now represent that Walter Reed has decided not to excess the District but rather will retain and reuse it and has or intends to initiate consultation procedures regarding repairs. Blanck Decl. ¶¶ 10, 12; Defs.' Supp.Mem. (Aug. 5, 1996) at 3.

Plaintiffs assert that although the 1992 Master Plan committed $2 million toward immediate repair and renovation activities, no such activities have taken place. They also claim that the Army failed to implement any of the October 1993 Bucher Report's recommendations, while defendants state that repairs were undertaken in response to the Bucher Report. A.R. at 1661–62. The parties also disagree about the Army's commitment to undertake future repairs: Plaintiffs characterize the Army as refusing to fund future measures, while defendants state that Walter Reed has expended millions of dollars in maintenance, repair and preservation of the Historic District—including recent expenditures of $367,468 in FY 1992; $508,151 in FY 1993; $290,527 from October 1993 to August 1994, A.R. at 1712; and $46,000 from January through July 1996, Blanck Decl. ¶ 7—and that certain projects have yet to be funded but that funding has been or is being sought.[8]

Defendants acknowledge that the facilities in the Historic District are a lower priority for maintenance funds than the direct medical care facilities, such as the hospital, since the Historic District buildings for the most part have no function and are not being used. Defs.' Mot. at 27. Walter Reed has an annual maintenance and repair budget of approximately $5 million for all three of its sections, including Forest Glen; that budget was cut by $500,000 in 1994. A.R. at 1649, 1659.

7. The summary of Army Regulation 420–40 (May 15, 1984), describes that regulation as follows:
[It] prescribes management responsibilities and standards for the treatment of historic properties ... on land controlled by the Army. It describes the steps for locating, identifying, evaluating, and treating historic properties in compliance with the [NHPA]. It explains how these steps can be done through a Historic Preservation Plan (HPP) and, as required, in consultation with the Advisory Council on Historic Preservation and the appropriate State Historic Preservation Officer.
Army Regulation 420–40 at i. The entire Army Regulation is contained in Plaintiffs' Exhibit 46.

8. The record reflects approximately $2,915,508 spent on repairs, maintenance and preservation in the Historic District since 1989: A.R. at 1712 (1989–1993 expenditures of $2,080,300); Declaration of Henry J. Henley (Feb. 1, 1996) ¶ 11–14 (nearly $500,000 spent on roof repair in April

1994, $60,000 spent from October 1, 1994 to December 31, 1995 on outside contractors performing repairs, $191,894 spent in FY 1995 on maintenance, and $83,314 spent in the first quarter of FY 1996), Exhibit 1 to Defs.' Memorandum in Opposition to Pls.' Motion for Preliminary Injunction; A.R. at 1896–1966 (chronicling ongoing daily, weekly and annual maintenance program). *See also* Defs.' Statement of Material Facts in Dispute ¶ 41; Blanck Decl. ¶ 8; Defs.' Supp.Mem. (Aug. 5, 1996) at 5. The record does not reflect expenditures made between 1984 and 1989. Plaintiffs argue that the Army has not demonstrated that the bulk of these expenditures were made on maintenance and repair items that are material to the legal issues in this case, Pls.' Response to Defs.' Statement of Material Facts Not in Genuine Dispute ¶¶ 40, 44, 50, 51, 53, 54, but they do not dispute that such sums were expended.

914

Walter Reed also has a backlog of $80 million worth of work orders. A.R. at 1649, 1659.

## II. STANDARD OF REVIEW

As a threshold matter, the parties dispute the proper standard of judicial review of the Army's actions under the NHPA. Defendants assert that judicial review is governed by the arbitrary and capricious standard of the Administrative Procedure Act, 5 U.S.C. § 706, while plaintiffs maintain that Section 305 of the NHPA, the attorneys' fees provision, 16 U.S.C. § 470w–4, creates an implied private right of action directly against the agency. Such an implied right of action would permit private enforcement of the statute and potentially trump the deferential standard of review provided by the APA. The Third and Fifth Circuits and one district court in the Ninth Circuit have found such an implied private right of action in the NHPA, although none of these courts has concluded that a less deferential standard of review is appropriate. *See Boarhead Corp. v. Erickson,* 923 F.2d 1011, 1017 (3d Cir.1991); *Bywater Neighborhood Assoc. v. Tricarico,* 879 F.2d 165, 167 (5th Cir.1989), *cert. denied,* 494 U.S. 1004, 110 S.Ct. 1296, 108 L.Ed.2d 474 (1990); *Vieux Carre Property Owners v. Brown,* 875 F.2d 453, 458 (5th Cir.1989), *cert. denied,* 493 U.S. 1020, 110 S.Ct. 720, 107 L.Ed.2d 739 (1990); *North Oakland Voters Alliance v. City of Oakland,* 1992 WL 367096, *5 (N.D.Cal.1992).[9]

The court of appeals for this Circuit has not addressed the issue, although one judge of this Court has rejected the argument that Section 305 constitutes a waiver of sovereign immunity. *Indiana Coal Council v. Lujan,* 774 F.Supp. 1385, 1394 n. 7 (D.D.C.1991) (J.H. Green, J.). Nor has our court of appeals ever explicitly described the standard of review under NHPA as being governed by the APA, in part because the NHPA cases in this Circuit primarily have involved deciding whether the terms of the Act applied in certain instances at all, and not, as in this case, assessing whether an agency's actions are sufficient under the law. *See Sheridan*

*Kalorama Historical Assoc. v. Christopher,* 49 F.3d 750, 754 (D.C.Cir.1995); *McMillan Park Committee v. National Capital Planning Comm'n,* 968 F.2d 1283 (D.C.Cir.1992); *Lee v. Thornburgh,* 877 F.2d 1053 (D.C.Cir. 1989). Other courts have applied the APA's arbitrary and capricious standard of review to agency decisions under the NHPA without explicitly addressing the issue of whether a private right of action is created by Section 305. *See, e.g., Connecticut Trust for Historic Preservation v. ICC,* 841 F.2d 479, 481–82 (2d Cir.1988); *Abenaki Nation of Mississquoi v. Hughes,* 805 F.Supp. 234, 239–40 (D.Vt.1992), *aff'd,* 990 F.2d 729 (2d Cir.1993); *Citizens for the Scenic Severn River Bridge v. Skinner,* 802 F.Supp. 1325, 1337 (D.Md. 1991) (applying same review standards to NHPA as apply to NEPA), *aff'd,* 972 F.2d 338 (4th Cir.1992).

"In order to establish an implied private right of action under a federal statute, a plaintiff bears a relatively heavy burden of demonstrating that Congress affirmatively or specifically contemplated private enforcement when it passed the relevant statute." *Samuels v. District of Columbia,* 770 F.2d 184, 194 (D.C.Cir.1985) (citing *Merrill Lynch, Pierce, Fenner & Smith v. Curran,* 456 U.S. 353, 377–78, 102 S.Ct. 1825, 1838–39, 72 L.Ed.2d 182 (1982)). The most important inquiry is whether Congress specifically intended to create such a right. *Merrill Lynch, Pierce, Fenner & Smith v. Curran,* 456 U.S. at 378, 102 S.Ct. at 1839; *Touche Ross & Co. v. Redington,* 442 U.S. 560, 575, 99 S.Ct. 2479, 2488–89, 61 L.Ed.2d 82 (1979); *see Naartex Consulting Corp. v. Watt,* 722 F.2d 779, 789–90 (D.C.Cir.1983), *cert. denied,* 467 U.S. 1210, 104 S.Ct. 2399, 81 L.Ed.2d 355 (1984). The existence of a statutory provision for attorneys' fees alone is not dispositive, although the First Circuit has acknowledged that it may, in some circumstances, be evidence of a congressional intent to create a private right of action. *Cousins v. U.S. Dep't of Transportation,* 880 F.2d 603, 606 (1st. Cir.1989); *NAACP v. Secretary of Housing*

9. The Fifth Circuit, notwithstanding its finding of an implied private right of action under the NHPA, applied APA standards of review on the merits. *Vieux Carre Property Owners v. Brown,* 875 F.2d at 460. Neither of the other two courts that have found an implied private right of action under the NHPA reached the question of the appropriate standard of review.

*and Urban Development,* 817 F.2d 149, 153 (1st Cir.1987).

■ The Court is not persuaded that Congress intended to create a private right of action against the federal government under the NHPA. First, it is not clear that such a private right of action would provide any more relief than the APA itself does. The statute does not make damages available to private parties but speaks only in terms of agency responsibility for preservationist goals. Since waivers of sovereign immunity are not to be implied and are to be strictly construed, *Lehman v. Nakshian,* 453 U.S. 156, 161, 101 S.Ct. 2698, 2701–02, 69 L.Ed.2d 548 (1981), finding a private right of action would permit plaintiffs to "do no more than ask the federal government to enforce the statute." *Cousins v. U.S. Dep't of Transportation,* 880 F.2d at 606. This is precisely the function of the APA.

Second, neither the language nor the legislative history of the attorneys' fees provision of the NHPA clearly indicates an intent on the part of Congress to create a private right of action. Section 305 of the NHPA provides:

> In any civil action brought in any United States district court by any interested person to enforce the provisions of this subchapter, if such person substantially prevails in such action the court may award attorneys' fees, expert witness fees, and other costs of participating in such action, as the court deems reasonable.

16 U.S.C. § 470w–4. The House Report states that "the intent [of Section 305] is to ensure that property owners, non-profit organizations and interested individuals who may otherwise lack the means for court action be awarded reasonable costs for actions taken under this Act." H.R.Rep. No. 1457, 96th Cong., 2d Sess. 46 (1980), *reprinted in* 1980 U.S.C.C.A.N. 6378, 6409. Since the APA does not authorize attorneys' fees, it would have been perfectly consistent for Congress to provide for attorneys' fees under the NHPA while contemplating that challenges to agency action would be evaluated under the standards of the APA.

Finally, even if there were a private right of action, nothing in the NHPA suggests that Congress intended to institute *de novo* review of agency preservationist actions or to create an exception to the presumption embodied in the APA that courts generally should defer to an agency's expertise and review its decisions under the deferential arbitrary and capricious/abuse of discretion standard. *See Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 415–16, 91 S.Ct. 814, 823–24, 28 L.Ed.2d 136 (1971). Indeed, the NHPA explicitly instructs agencies to undertake preservationist activities that are "consistent with [their] mission." 16 U.S.C. § 470h–2(a)(1). Assessing the nature of the Army's mission is, of course, particularly within the scope of that Department's expertise.

The Court is further persuaded by the reasoning of the First Circuit in *NAACP v. Secretary of Housing and Urban Development,* 817 F.2d 149 (1st Cir.1987). In that case, Circuit Judge (now Justice) Breyer, writing for the court, noted that "it is difficult to understand why a court would ever hold that Congress, in enacting a statute that creates federal obligations, has implicitly created a private right of action against the *federal* government, for there is hardly ever any need to do so" because of the omnipresent availability of APA review. *Id.* at 152. In those few cases in which courts have inferred a private right of action against the federal government, "the courts have not even considered the role of the APA." *Id.* at 153. Indeed, the very existence of the APA makes it reasonable to assume that "when Congress means to permit a private party to ask a court to review the legality of federal action in a manner that differs from APA review, Congress will say so explicitly in the statute." *Id.*

■ In this case, the Army's actions are fully reviewable under the APA. The Court concludes that Congress did not create or intend to create an independent private right of action against the federal government under Section 305 of the NHPA. Accordingly, the Court will review the Army's actions under the arbitrary and capricious standard of the Administrative Procedure Act, 5

U.S.C. § 706, and based on the administrative record created by the agency.[10]

## III.  THE NATIONAL HISTORIC PRESERVATION ACT

Section 106 of the National Historic Preservation Act is a procedural provision and the provision under which almost all NHPA cases are prosecuted.  It provides:

> The head of any Federal agency having direct or indirect jurisdiction over a proposed Federal or federally assisted undertaking in any State ... shall, prior to the approval of the expenditure of any Federal funds on the undertaking ..., take into account the effect of the undertaking on any district, site, building, structure, or object that is included in or eligible for inclusion in the National Register.  The head of any such Federal agency shall afford the Advisory Council on Historic Preservation ... a reasonable opportunity to comment with regard to such undertaking.

16 U.S.C. § 470f.  The majority of NHPA cases that have reached the courts concern instances where a federal agency is alleged

to have failed to comply with the consultation provisions of Section 106.

Section 110 of the NHPA was added to the NHPA in 1980 to "clarif[y] and codif[y] the minimum responsibilities expected of Federal agencies in carrying out the purposes of th[e] Act."  *Lee v. Thornburgh,* 877 F.2d 1053, 1057 (D.C.Cir.1989) (quoting H.R.REP. No. 1457, 96th Cong., 2d Sess. 36 (1980), *reprinted in* 1980 U.S.C.C.A.N. 6378, 6399).  Although the language of the section is broad, it was not "intended to change the preservation responsibilities of Federal agencies as required by any other laws, executive orders or regulations...."  *Id.*  Section 110 provides in relevant part:

> (a)(1) The heads of all Federal agencies shall assume responsibility for the preservation of historic properties which are owned or controlled by such agency....  Each agency shall undertake, consistent with the preservation of such properties and the mission of the agency and the professional standards established pursuant to section 470a(g) of this title, any preservation, as may be necessary to carry out this section.[11]
>
> (2) Each Federal agency shall establish ... in consultation with the Secretary, a

---

**10.**  Defendants have moved to strike the affidavits of Bonnie Rosenthal, Pls.' Exs. 5, 44, Kay Fanning, Pls.' Ex. 45, Lauren Bowlin, Pls.' Ex. 22, John Sonner, Pls.' Ex. 43, and Ward Bucher, Pls.' Ex. 39.  These affidavits are all dated April 1995 and describe the effects of deterioration on the buildings in the Historic District.  Exhibits 44 and 45 include photographs of the District.  Defendants also moved to strike the EDAW Adaptive Reuse Study, dated March 1995, that estimates the cost of repairing the District.  Pls' Ex. 52.  Defendants argue that under the APA the Court cannot consider information that was not before the agency at the time the decision was made.  Plaintiffs argue that the affidavits and the EDAW study demonstrate the effects of the Army's neglect.

Supplementation of the administrative record may be appropriate in a number of circumstances, in particular where "evidence arising after the agency action shows whether the decision was correct or not; in cases where agencies are sued for failure to take action; in cases arising under the National Environmental Policy Act; and in cases where relief is at issue, especially at the preliminary injunction stage."  *Esch v. Yeutter,* 876 F.2d 976, 991 (D.C.Cir.1989).  This case presents several reasons for supplementation: plaintiffs challenge the correctness of

Walter Reed's decisions; they are suing Walter Reed for its failure to take action; evidence of deterioration arose during and after Walter Reed's various decisions affecting the Historic District; and defendants themselves rely on the similarities between Section 106 of the NHPA and NEPA.  In addition, there are substantial issues regarding the appropriate relief and plaintiffs have requested a preliminary injunction.  Accordingly, plaintiffs' affidavits regarding the deterioration of the District are properly considered by the Court and they will not be stricken.

**11.**  *16 U.S.C. § 470a(g) provides:* "In consultation with the Advisory Council on Historic Preservation, the Secretary [of the Interior] shall promulgate guidelines for Federal agency responsibilities under section 470h–2 of this title."  The guidelines are located at 53 Fed.Reg. 4729 (Feb. 17, 1988) ("Section 110 Guidelines").  *See also* Secretary of the Interior's Standards and Guidelines for Archeology and Historic Preservation, 48 Fed.Reg. 44716 (Sept. 29, 1983).  16 U.S.C. § 470w(8) defines "preservation" to "include[] identification, evaluation, recordation, documentation, curation, acquisition, protection, management, rehabilitation, restoration, stabilization, maintenance and reconstruction, or any combination of the foregoing activities."

preservation program for the identification of, evaluation, and nomination to the National Register of Historic Places, and protection of historic properties. Such program shall ensure—

\* \* \* \* \* \*

(B) that such properties under the jurisdiction or control of the agency as are listed or may be eligible for the National Register are managed and maintained in a way that considers the preservation of their historic, archaeological, architectural, and cultural values in compliance with section 470f [Section 106] of this title.

\* \* \* \* \* \*

(d) Consistent with the agency's missions and mandates, all Federal agencies shall carry out agency programs and projects ... in accordance with the purposes of this subchapter and, give consideration to programs and projects which will further the purposes of this subchapter.

\* \* \* \* \* \*

(f) Prior to the approval of any Federal undertaking which may directly and adversely affect any National Historic Landmark, the head of the responsible Federal agency shall, to the maximum extent possible, undertake such planning and actions as may be necessary to minimize harm to such landmark, and shall afford the Advisory Council on Historic Preservation a reasonable opportunity to comment on the undertaking.

16 U.S.C. § 470h–2(a)(1), (a)(2), (d), (f) (as amended 1992).

In this case, plaintiffs assert that the Army's actions in permitting the decay and deterioration of the Historic District violate the mandate of Section 110. Plaintiffs would have the Court interpret Section 110(a)(1) as creating an independent substantive requirement that agencies engage in minimal preservationist activities so long as such activities are consistent with the agency's mission. Under such an interpretation, whether Walter Reed violated the NHPA by permitting the buildings of the Historic District to deteriorate would be a question separate and apart from whether it also violated the proce-

dural provisions of the Act contained in Section 106 and other subsections of Section 110. Only one court has come close to ruling on this interpretive question. *See North Oakland Voters Alliance v. City of Oakland,* 1992 WL 367096, \*5 (N.D.Cal.1992) (finding that plaintiffs stated a claim under the NHPA based on Oakland's failure to maintain and preserve historic property while engaging in the Section 106 consultation process).

Defendants reply that all of the requirements of the NHPA, including those in Section 110, are procedural, that the NHPA is designed to ensure that federal agencies merely take into account or consider the effect of their actions on historic places as part of the planning process for those properties, that there is no substantive requirement that agencies undertake particular preservationist activities at all, and that Congress intended the provisions of Sections 106 and 110 to have a limited reach. Defendants' underlying premise is that the statute does not mandate preservation but merely encourages it, citing this Circuit's opinion in *Lee v. Thornburgh,* 877 F.2d at 1056. They also rely on *Waterford Citizens' Assoc. v. Reilly,* 970 F.2d 1287, 1290 (4th Cir.1992) ("Congress did not intend [Section 106] to impose general obligations on federal agencies to affirmatively protect preservation interests."); *Connecticut Trust for Historic Preservation v. ICC,* 841 F.2d 479, 483–84 (2d Cir.1988) ("NEPA and NHPA require only that agencies acquire information before acting."); *United States v. 162.20 Acres of Land, More or Less, Etc.,* 639 F.2d 299, 302 (5th Cir.) ("[Section 106] neither ... forbid[s] the destruction of historic sites nor command[s] their preservation."), *cert. denied,* 454 U.S. 828, 102 S.Ct. 120, 70 L.Ed.2d 103 (1981). Each of these cases, however, focuses on the language of Section 106 and does not address the effect, if any, of the seemingly more substantive language of Section 110. Indeed, most courts discuss the obligations of Section 106 and the Act as a whole as if they were interchangeable.

## A. *The Section 106 Consultation Process*

Section 106 of the NHPA requires that agencies give the Advisory Council on His-

toric Preservation a reasonable opportunity to comment on any "undertaking" that will "adversely affect" a listed property. 16 U.S.C. § 470f; *see McMillan Park Committee v. National Capital Planning Comm'n*, 968 F.2d at 1284–85; *Lee v. Thornburgh*, 877 F.2d at 1056. The NHPA defines "undertaking," in relevant part, as "a project, activity, or program funded in whole or in part under the direct or indirect jurisdiction of a Federal agency" if carried out by a federal agency, with federal financial assistance or requiring a federal permit, license or approval. 16 U.S.C. § 470w(7). 36 C.F.R. § 800.2(o) defines an "undertaking" as

> any project, activity or program that can result in changes in the character or use of historic properties.... The project, activity or program must be under the direct or indirect jurisdiction of a Federal agency. Undertakings include new and continuing projects, activities, or programs and any of their elements not previously considered under section 106.

36 C.F.R. § 800.9(b)(4) defines an "adverse effect" of an undertaking as including but not limited to "[n]eglect of a property resulting in its deterioration or destruction."

Different circuits describe the Section 106 process as imposing more or less stringent or limited obligations upon agencies. *Compare United States v. 162.20 Acres of Land, More or Less, Etc.*, 639 F.2d at 302 ("While the [NHPA] may seem to be no more than a 'command to consider,' it must be noted that the language is mandatory and the scope is broad.") *with Waterford Citizens' Association v. Reilly*, 970 F.2d at 1290–91 ("[T]he scope of the obligations imposed upon federal agencies by the enactment of section 106 is quite narrow."). Nevertheless, Section 106 is universally interpreted as requiring agencies to consult and consider and not to engage in any particular preservation activities per se. The issue here is when the Army became obligated to consult with the Advisory Coun-

cil on Historic Preservation and whether it did so at that time.

The Historic District was listed in the National Register in 1972. The Army decided not to excess the Historic District as early as 1979 and cemented that initial decision in 1984 despite having acquired additional information. Yet, no "Section 106 Report" was prepared until 1990, and that was done in connection with the preparation of a revised Master Plan in 1991.[12] Furthermore, there were no consultations with the relevant boards, commissions and historic trusts until 1991, and the revised Master Plan was not finally modified and approved until 1992. The question is whether any of these actions—or lack of action—violated the NHPA. The Army argues that until it affirmatively decided to excess the District in 1991 there was no "undertaking" on which to comment. Plaintiffs assert that the Army's failure to maintain the Historic District since at least 1984, when the Army made its decision not to excess the District, constitutes "demolition by neglect" that warrants relief.

■ It is clear that "an agency need not satisfy the § 106 process at all ... unless it is engaged in an undertaking." *McMillan Park Committee v. National Capital Planning Comm'n*, 968 F.2d at 1289. Although the regulations consider neglect of a property that results in deterioration or destruction to be a cognizable "adverse effect" of an undertaking, not every instance of neglect or destruction can be said to flow from a cognizable undertaking. As a general matter, the APA defines "agency action" to include "failure to act," 5 U.S.C. § 551(13), and, where an agency maintains a policy of inaction in the face of an explicit statutory mandate, generally a court may set that policy aside. *NAACP v. Secretary of Housing and Urban Development*, 817 F.2d at 160. The explicit terms of Section 106, however, require a finding not just of agency "action" but of an

---

12. Master Plans are general planning documents, *see supra* note 4, and do not trigger the Section 106 consultation process. The Maryland Historical Trust itself has stated that the preparation of a Master Plan does not constitute an undertaking. A.R. at 590. Although plaintiffs do not expressly concede this point, *see* Pls.' Re-

sponse to Defs.' Statement of Material Facts Not in Genuine Dispute ¶ 42, plaintiffs do not assert that Master Plans are cognizable underakings but rather dismiss them as mere proposals that do not satisfy the Army's obligations to engage in historic preservation. *See* Pls.' Mem at 23–24; Pls.' Opp'n at 20–24; Pls.' Reply at 17–19.

"undertaking"—that is, "a project, activity, or program." 16 U.S.C. § 470w(7).

■ An agency's failure to act, without more, is not an "undertaking" under Section 106; indeed, if it were there would be a constant and ongoing requirement for ACHP comment and consultation. *See Sheridan Kalorama Historical Assoc. v. Christopher,* 49 F.3d at 754 (State Department's failure to disapprove Turkish Embassy's plan to . demolish building was not an undertaking where no federal funds or approval were involved). On the other hand, an undertaking includes any "activity ... that can result in changes in the character or use of historic properties" and may include not only new but also "continuing" projects. 36 C.F.R. § 800.2(*o*). Thus, the NHPA contemplates a certain level of agency vigilance even in the absence of a specific new project. For example, Section 106 procedures must be "applied to ongoing Federal actions as long as a Federal agency has opportunity to exercise authority at any stage of an undertaking where alterations might be made to modify its impact on historic preservation goals." *Vieux Carre Property Owners v. Brown,* 948 F.2d 1436, 1444–45 (5th Cir.1991); *see Morris County Trust for Historic Preservation v. Pierce,* 714 F.2d 271, 280 (3d Cir.1983); *WATCH v. Harris,* 603 F.2d 310, 326 (2d Cir.), *cert. denied,* 444 U.S. 995, 100 S.Ct. 530, 62 L.Ed.2d 426 (1979). Even the Army recognizes that such ongoing and routine activities as maintenance and repair may rise to the level of undertakings. Army Regulation 420–40, Glossary–3 (May 15, 1984), Pls.' Ex. 46. Accordingly, the analysis turns on the nature of the projects, activities and decisions that properly trigger Section 106 review.

In this regard, it is instructive to examine case law decided under the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321–4361. While Section 106 of the NHPA and NEPA are not identical, many courts fruitfully compare them, and their similarities shed light on the issue of agency action and inaction. *See McMillan Park Committee v. National Capital Planning Comm'n,* 968 F.2d at 1290 (Randolph, J., concurring). In passing the NHPA, Congress inserted historic preservation concerns into all aspects of agency decision making by requiring agency heads to "take into account the effect of [any] undertaking" on historic buildings and structures, 16 U.S.C. § 470f, much as NEPA injects environmental concerns into all major federal actions. Both statutes require the government to conduct certain procedural and informational activities before embarking on projects that might affect, respectively, historic sites or the environment. Neither NEPA nor Section 106 mandates a particular outcome of governmental decisions; rather each defines the processes by which those decisions must be made. *See Apache Survival Coalition v. United States,* 21 F.3d 895, 906 (9th Cir. 1994); *Colorado River Indian Tribes v. Marsh,* 605 F.Supp. 1425, 1440 & n. 11 (C.D.Cal.1985).

The obligation to prepare an environmental impact statement under NEPA is triggered by the proposal of a "major federal action," 42 U.S.C. § 4332(2)(C), which the court of appeals for this Circuit has interpreted as requiring either federal action or some "overt act" by the federal government that furthers the project of another sovereign or non-federal entity. *Defenders of Wildlife v. Andrus,* 627 F.2d 1238, 1244–45 (D.C.Cir. 1980) (citing *Kleppe v. Sierra Club,* 427 U.S. 390, 401, 96 S.Ct. 2718, 2726, 49 L.Ed.2d 576 (1976)). In *Defenders of Wildlife,* the court ruled that the Secretary of the Interior's inaction—specifically, his failure to exercise his power to prevent the State of Alaska from killing 170 wolves—did not constitute a "federal action" requiring the preparation of an environmental impact statement. *Id.* at 1245. *See also Cross–Sound Ferry Services, Inc. v. ICC,* 934 F.2d 327, 334 (D.C.Cir.1991) (describing *Defenders of Wildlife* as holding that an "agency's mere refusal to exercise its statutory authority to act" does not constitute a federal action).

■ In 1984, the Army decided not to excess the Historic District because the costs were too high and the process would take too long. Defs.' Statement of Facts in Dispute at 1 ¶ 28; Pls.' Statement of Material Facts ¶ 30; 1989 Survey at 3, A.R. at 287. This was not a mere failure to prevent another

entity from taking action, *cf. Sheridan Kalorama Historical Assoc. v. Christopher*, 49 F.3d at 754; *Defenders of Wildlife v. Andrus*, 627 F.2d at 1244–45, but a considered, affirmative decision by Walter Reed about how to allocate its limited resources. That decision had the sort of serious and long-term consequences for the Historic District that the NHPA requires be undertaken in consultation with the ACHP. Indeed, the record is replete with evidence attesting to the consideration given over the years to the decision whether to excess the District,[13] and defendants acknowledge that an affirmative decision was made in 1984 not to do so. Defs.' Statement of Facts in Dispute at 1 ¶ 28. Yet there were no Section 106 consultations with the Advisory Council on Historic Preservation, the National Capital Planning Commission or the various Maryland state agencies about the overall disposition of the Historic District until 1991. The Court concludes that the 1984 decision not to excess the District was an undertaking under Section 106. It therefore should have been made in consultation with the Advisory Council on Historic Preservation.

### B. Section 110, The Secretary's Section 110 Guidelines and the Army's Regulations

Plaintiffs contend that Walter Reed not only disregarded the Section 106 consultation process but also violated the substantive mandate contained in Section 110 to repair and maintain the buildings in the District. Agency obligations under Section 110, however, are far less defined than those under Section 106, and the parties vigorously disagree as to their scope and effect.

#### 1. Section 110

The contested language of Section 110 reads as follows: "Each agency shall undertake, consistent with the preservation of such [historic] properties and the mission of the agency and the professional standards estab-

lished pursuant to section 470a(g) of this title, any preservation, as may be necessary to carry out this section." 16 U.S.C. § 470h–2(a)(1). In addition, each agency "shall ensure" that properties listed in or eligible for the National Register of Historic Places "are managed and maintained in a way that considers the preservation of their historic [and] architectural ... values in compliance with Section 470f [Section 106] of this title." 16 U.S.C. § 470h–2(a)(2)(B). In this case, the District was listed in the National Register in 1972 and the Army's most significant decision was taken in 1984 when the Army decided not to excess the District but rather to retain control over it. That 1984 decision, and the ongoing policy thereafter to treat the historic preservation of the District's buildings as a low priority, gave rise to much of the deterioration now complained of by plaintiffs. *See* 1989 Survey at 3, A.R. at 287.

The meaning of Section 110 is not clear on its face. On the one hand, the use of the word "shall" in Sections 110(a)(1) and (2) suggests that agencies have a mandatory obligation to engage in preservation, separate and apart from their obligations under Section 106. On the other hand, the section refers several times to the Section 106 consultation process and uses the word "consider" three times in describing an agency's responsibilities. 16 U.S.C. § 470h–2(a)(2)(B) & (C), (d). It also provides that the agency must act consistent with its "missions and mandates." 16 U.S.C. § 470h–2(d). Reading the section as a whole, this suggests that Section 110 represents an elucidation and extension of the Section 106 process but not its replacement by new and independent substantive obligations of a different kind.

Although the District of Columbia Circuit has interpreted the NHPA on several occasions, none of its decisions has addressed the scope of Section 110(a) or the federal government's obligations thereunder. Rather, the cases that have reached our court of appeals

---

13. *See* Memorandum from Major Franklin Goriup, WRAMC (July 6, 1979) (rejecting GSA proposal to excess Historic District), A.R. at 4351; Unclassified WRAMC Memorandum (July 2, 1979) (same), A.R. at 2225; Letter from Colonel Gerald D. Allgood, Army Health Services Command, to Maryland SHPO, (May 14, 1984), A.R. at 1574; Letter from Maryland Historical Trust to Colonel Allgood (June 21, 1984), A.R. at 1577; Letter from Major General Lewis Mologne to Army Medical Research and Development Command (July 27, 1984) (noting that the Historic District was to be sold), A.R. at 2853.

have either primarily concerned the scope of Section 106 or dealt with projects undertaken by non-federal entities. In *Lee v. Thornburgh*, 877 F.2d 1053 (D.C.Cir.1989), the court held that Section 106 and subsections (b) and (d) of Section 110 did not apply to a project undertaken by the District of Columbia because no *federal* agency had authority to license or approve expenditures for the project. The court concluded that the requirements of the Act "are triggered only when approval or financial assistance from a federal agency are involved." *Id.* at 1056. The court recognized that "Congress intended these provisions to have a limited reach; they are aimed solely at discouraging federal agencies from ignoring preservation values in projects they initiate, approve funds for or otherwise control." *Id.* While the court construed two subsections of Section 110 (although not subsection (a) at issue here), it did so specifically in order to answer the question of whether the statute applied to the District of Columbia project at all. As a result, the court did not describe what the federal government's obligations would have been under Section 110(a) if that section of the statute had in fact been implicated.

In *McMillan Park Committee v. National Capital Planning Comm'n*, 968 F.2d 1283 (D.C.Cir.1992), the court decided that the act of amending a comprehensive plan governing the commercial development of McMillan Park did not constitute an "undertaking" under Section 106 because the possible adverse effects of the amendments had previously been considered; the court did not discuss Section 110 at all. In *Sheridan Kalorama Historical Assoc. v. Christopher*, 49 F.3d 750 (D.C.Cir.1995), the court decided that the Secretary of State's failure to disapprove the Republic of Turkey's proposal to demolish its chancery building did not constitute an "undertaking" for Section 106 purposes; again the court did not discuss Section 110. While each of these decisions might be read to imply that the only obligations imposed by the NHPA flow from Section 106 because the court did not mention any obligation arising under Section 110, the Court declines to infer such a sweeping conclusion from the mere absence of discussion.

The legislative history of Section 110, which was added to the NHPA in 1980, provides limited guidance as to the section's purposes. *See* H.R.REP. No. 1457, 96th Cong., 2d Sess. 36 (1980), *reprinted in* 1980 U.S.C.C.A.N. 6378, 6399 ("House Report"). The House Report describes the aims of Section 110 in relevant part as follows:

The new Section 110 clarifies and codifies the minimum responsibilities expected of Federal agencies in carrying out the purposes of this Act.... It is not intended to change the preservation responsibilities of Federal agencies as required by any other laws, executive orders or regulations, nor limit the President's authority to specify additional responsibilities.

Section 110(a)(1) requires a Federal agency to assume preservation responsibilities for properties owned or under the control of the agency. It is intended that the degree of preservation responsibility be commensurate with the extent of the agency's interest in or control of a particular property.... Agencies are further directed to undertake such preservation as may be necessary (including rehabilitation, documentation, etc.) in accordance with the Secretary's standards.

\* \* \* \* \* \*

Section 110(d) requires that, consistent with their missions and mandates, all Federal agencies will carry out their programs ... so that historic preservation interests are affirmatively addressed.... It is recognized that most Federal agencies have a primary purpose other than historic preservation; however, it is reasonable to expect that they also view themselves as multiple resource managers responding to diverse economic, social and environmental concerns—including the concerns of historic preservation....

Section 110(f) establishes a higher standard of care to be exercised by Federal agencies when considering undertakings that may directly and adversely affect National Historic Landmarks. Agencies are directed to undertake, to the maximum extent possible, such planning and actions as may be necessary to minimize harm to such a landmark and to provide the Advi-

**922**

sory Council on Historic Preservation a reasonable opportunity to comment on such proposed actions.... This section does not supersede Section 106, but complements it by setting a higher standard for agency planning in relationship to landmarks before the agency brings the matter to the Council....

House Report at 36–38, *reprinted in* 1980 U.S.C.C.A.N. at 6399–6401.

■ The Court concludes that Section 110(a) cannot be read to create new substantive preservationist obligations separate and apart from the overwhelmingly procedural thrust of the NHPA as described by every court that has considered the Act. In interpreting other subsections of Section 110, the D.C. Circuit has reasoned that "the legislative history of § 110, though scant, supports [ ] reading [ ] that section in conjunction with § 106." *Lee v. Thornburgh*, 877 F.2d at 1057. The court pointed out that when Section 110 was added to the NHPA in 1980, Congress made clear that the new section "is not intended to change the preservation responsibilities of Federal agencies as required by any other laws, executive orders or regulations." *Id.* Plaintiffs' interpretation would create vast new preservationist responsibilities unrelated to the consultation provisions of Section 106 to which the rest of Section 110 constantly refers. Indeed, under plaintiffs' theory, Section 110 would replace Section 106 as the heart and soul of the NHPA, requiring an agency to spend money on historic preservation regardless of whether it was engaged in or contemplating an undertaking. Nothing in the statute or the legislative history suggests that Congress intended to alter the nature of the NHPA in such a fashion when it amended it in 1980, and the Court finds that Congress had no such intention.

### 2. *The Secretary's Guidelines and the Army's Regulations*

The guidelines promulgated by the Secretary of the Interior support this interpretation. *See* Guidelines for Federal Agency Responsibilities Under Section 110 of the National Historic Preservation Act ("Section 110 Guidelines"), 53 Fed.Reg. 4728 (Feb. 17, 1988); *see also* Secretary of the Interior's Standards and Guidelines for Archeology and Historic Preservation, 48 Fed.Reg. 44716 (Sept. 29, 1983).[14] The Section 110 Guidelines state that "[t]he basic purpose of section 110(a)(1) is to cause agencies when planning or carrying out their programs, to consider whether there are ways that the use of historic properties can be effectively integrated into such programs so as to advance program purposes while preserving or even enhancing the integrity of the properties." Section 110 Guidelines, 53 Fed.Reg. at 4731. The Guidelines further explain:

Section 110(a)(1) also requires agencies to "undertake, consistent with the preservation of such properties and the mission of the agency ... any preservation as may be necessary to carry out this section." .... Preservation plans should be developed for historic property types that the agency knows it has under its jurisdiction or control....

In managing historic properties, agencies should consider a variety of factors in addition to, but not in lieu of, the significant element or elements of the properties which qualify them for inclusion in the National Register.

Section 110 Guidelines, 53 Fed.Reg. at 4732.

■ The Section 110 Guidelines require the development by agencies of historic preservation plans and list a variety of factors that agencies "should consider" in establishing such plans and in managing historic properties. Nowhere, however, do they state that agencies have an affirmative obligation to spend money to preserve historic buildings. Rather, the entire thrust of the Guidelines is to channel agency decisionmaking in an informed preservationist direction consistent with the agency's mission. Since the NHPA expressly delegates the responsibility for promulgating such guidelines to the Secretary of the Department of the Interior, the Secretary's interpretation of Section 110 is entitled to substantial deference from the

**14.** 16 U.S.C. § 470a(g) requires "the Secretary [of the Interior] [to] promulgate guidelines for Federal agency responsibilities under section 470h–2 of this title."

Court. *Lyng v. Payne,* 476 U.S. 926, 939, 106 S.Ct. 2333, 2341–42, 90 L.Ed.2d 921 (1986); *Orengo Caraballo v. Reich,* 11 F.3d 186, 192–93 (D.C.Cir.1993).

Walter Reed's obligations under Section 110 are further defined by the Army's own regulations. Army Regulation 420–40, promulgated in 1984 in compliance with the NHPA and various of the Secretary of the Interior's regulations and guidelines for historic preservation, provides in detail for the preparation of a Historic Preservation Plan ("HPP") as the main mechanism by which the Army is to comply with the requirements and implementing regulations of Sections 106 and 110 of the NHPA. Pls.' Ex. 46. Army Regulation 420–40 also provides guidelines for the programming, staffing, contracting, information management and disposal procedures pertaining to historic properties. Plaintiffs assert that the Army violated Army Regulation 420–40 both by neglecting the Historic District and by failing to prepare a Historic Preservation Plan and that, in so doing, it violated the NHPA. The Army replies that the Cultural Resource Management Plan ("CRMP"), A.R. at 922, adopted in 1992, serves as the HPP for the Historic District and therefore that Walter Reed is in compliance with its own regulations and with Sections 106 and 110 of the NHPA.[15]

■ The Court finds that the CRMP was the Historic Preservation Plan for the Historic District and that it satisfies the requirements of Army Regulation 420–40. The CRMP contains an extensive discussion of the history, condition and present needs of the Historic District. It proposes a detailed protection plan outlining the procedures for maintaining the historic properties, including the procedures to be followed under Section 106. A.R. at 941–62.[16] Indeed, plaintiffs concede that the CRMP "provide[s] very specific and detailed guidance for the treatment and protection of the Historic District." Pls.' Mem. at 16 n. 6.[17] Accordingly, the Court finds that the Army has been in compliance with the Section 110 Guidelines and its own regulations since 1992 when the CRMP was created and officially adopted.

Plaintiffs argue, however, that even if the CRMP for the Historic District serves as a valid HPP, Walter Reed has not carried out the preservation and maintenance activities required by the CRMP, Army Regulation 420–40 and Section 110, and that the Army therefore is still out of compliance. For their part, defendants point to nearly three million dollars that have been spent on the Historic District since 1989, nearly two million of which was spent since 1992 when the CRMP was promulgated. *See* note 8, *supra.* While it is true that the CRMP calls for two million dollars to be spent specifically on roof repair and maintenance, money that does not appear to have been allocated, the Army has explained that those funds, while originally available, were diverted to other Army projects and that Walter Reed continues to seek funding. A.R. at 1669–70.

The Court concludes that since Walter Reed has formally complied with Army Regulation 420–40 by creating and adopting the CRMP, has spent substantial sums of money on repair, maintenance and preservation activities (although obviously not enough to avoid significant deterioration) and continues to make efforts to obtain additional funding to carry out its obligations under the CRMP, Walter Reed has complied with the Secretary's Guidelines and its own regulations.

15. While an agency is entitled to substantial deference when it interprets statutes and regulations whose enforcement is committed to that particular agency, *Orengo Caraballo v. Reich,* 11 F.3d at 192–93, the NHPA delegates to the Army no particular interpretive or enforcement authority. Thus, the Army's interpretation of the NHPA is not entitled to the deference accorded to the Secretary of the Interior.

16. By contrast, the 1992 Master Plan, like the earlier Master Plans, devotes a single general section to the Historic District and does not reflect the substantial level of consideration and analysis required by the Section 110 Guidelines. 1991 Master Plan at 3–7, A.R. at 726.

17. Plaintiffs assert that the CRMP was only a draft and was never formally approved or adopted by the Army, but the portions of the record to which they cite do not support that assertion. Deposition of Henry Henley ("Henley Dep.") at 262 (Excerpts from Jan. 18, 27, Feb. 1, 1995), Pls.' Ex. 49; Letter from William Pencek, Deputy SHPO, Maryland Historical Trust, to Lt. Colonel Quick, WRAMC, at 4–6 (June 4, 1992), A.R. at 348–50.

Its manner of doing so cannot be said to be arbitrary and capricious. It therefore has not violated Section 110 of the NHPA, at least since 1992.

■ From 1984 until 1992, however, Walter Reed was in compliance neither with Section 110 nor with its own regulations.[18] Defendants have identified no documents in the administrative record that demonstrate that Walter Reed engaged in a deliberate, considered decisionmaking process to assess, consider and plan for the preservation needs of the Historic District during that period. Until the CRMP was adopted in 1992, the only planning document to make any reference to the historic needs of the District at all was the Master Plan of 1977, A.R. at 581, and between 1977 and 1992 no Master Plans were developed. *See* Def.'s Statement of Material Facts ¶¶ 36–40. It was not until 1991, when Major General Cameron proposed to excess the District and triggered a series of assessments by Walter Reed, that Walter Reed began seriously to assess its obligations under the NHPA. Accordingly, on this record, the Court finds that Walter Reed violated Section 110 and its own Army Regulation 420–40 beginning in 1984. These violations lasted until 1992 when the considered decisionmaking process finally produced the CRMP.

## IV. CONCLUSION

From 1984, when Army Regulation 420–40 formalized the Army's obligations under Section 110 of the NHPA, until 1992, the Army violated Section 110 and its own regulations by neglecting the buildings in the Historic District without considering how to undertake, consistent with its mission, their preservation or alternative use. The Army also violated Section 106 of the NHPA in 1984 by failing to initiate consultation procedures with the Advisory Council on Historic Preservation when it decided not to excess the District, even though it was clear that the decision would cause further deterioration of the historic buildings.

Plaintiffs acknowledge that the Army undertook the proper Section 106 consultation procedures with respect to Major General Cameron's 1991 proposal to excess the District. The Army now represents to the Court that it is presently or is about to be engaged in further Section 106 consultation procedures because it has decided not to excess the District after all. Blanck Decl. ¶ 7, 10–12; Defs.' Supp.Mem. at 3–6 (Aug. 5, 1996). The Court concludes that no purpose would be served by ordering the Army to engage in Section 106 consultation with respect to decisions made years ago. Similarly, Walter Reed's 1992 Cultural Resource Management Plan, while belated, rectifies the procedural and informational harm done by the Army's failure to prepare a Historic Preservation Plan between 1984 and 1992. Accordingly, the Court will not order the Army to undertake the consultations and assessments contemplated by Sections 106 and 110 of the NHPA and Army Regulation 420–40 since the Army has represented to the Court that it is in the process of doing so.

This leaves the very serious issue of the deterioration and damage that has resulted from the Army's neglect and failure to expend adequate resources on the preservation of the Historic District. Plaintiffs do not ask the Court, as in the typical NHPA case, to require the Army to halt a proposed undertaking such as the demolition or construction of a building, but rather to repair existing buildings to bring them back to a former level of integrity that pre-dates the Army's neglect. Plaintiffs argue that the Army's noncompliance with the NHPA and its own regulations caused significant harm to the buildings in the Historic District and that the Army is now obligated to make the District whole.

Plaintiffs are clearly correct that the Army's noncompliance has caused real harm. On the other hand, Walter Reed currently

---

**18.** Walter Reed might arguably have been in violation of Section 110 as early as 1980 when Section 110 was added to the NHPA. Since the Secretary of the Interior's Section 110 Guidelines were not promulgated until 1988, and Army Regulation 420–40 not until 1984, it is disputable whether the Army was properly on notice of its obligations prior to 1984. From 1984 onward, however, Walter Reed's obligations were clearly defined by Army Regulation 420–40 interpreting Section 110.

spends significant funds on repairing and maintaining the District and it is now in compliance with Sections 106 and 110 and its own regulations. The Court having concluded that Section 110 was not intended to create new substantive preservationist obligations, it follows that the NHPA does not give the Court the authority to order the Army to turn back the hands of time, or even to spend more money to halt further deterioration while the Army completes its plans for the Historic District.

This conclusion flows from the limited nature of Section 110 itself. The NHPA requires the Army to undertake the level of preservation necessary to carry out Section 110, consistent with its mission. 16 U.S.C. § 470h–2(a)(1). Section 110 is to be read in conjunction with Section 106 which constitutes the main thrust of the NHPA. The case law in this and other circuits holds that an agency's duty to act under the NHPA is triggered only when there is an undertaking and that that obligation, once triggered, is procedural in nature. Section 110 itself does not require anything more, since the addition of Section 110 to the statute was not intended to expand the preservationist responsibilities of federal agencies beyond what the NHPA already required. Moreover, the Section 110 Guidelines demonstrate that the Secretary of the Interior has interpreted Section 110 to embody the requirement that agencies thoroughly consider preservationist goals in all aspects of agency decisionmaking but that Section 110 does not itself affirmatively mandate the preservation of historic buildings or other resources. The Court therefore concludes that Section 110, read in conjunction with Section 106, the statute as a whole and the case law, did not require Walter Reed to undertake any preservation beyond what was necessary to comply to the fullest extent possible with, and in the spirit of, the Section 106 consultation process and with its own Historic Preservation Plan.

While the Army could and, in a perfect world, should have done more to preserve the Historic District, the APA does not permit this Court to substitute its judgment for that of the agency with respect to resource allocations, so long as those allocations are not arbitrary or capricious, an abuse of discretion or contrary to law. *See Citizens to Preserve Overton Park v. Volpe*, 401 U.S. at 415, 91 S.Ct. at 823. While the Court may disagree with the Army's decisions—individual and cumulative—to permit the buildings of the Historic District to deteriorate, the Court finds that the Army's expenditure of nearly two million dollars in repairs and maintenance since 1992 was not insignificant, consistent with Walter Reed's mission and mandate.[19] The Court concludes that the Army's level of expenditure, although low in relation to the expensive preservation needs of the Historic District, did not constitute an abuse of discretion or an arbitrary and capricious response to the dictates of Section 110, the Secretary of the Interior's Guidelines and Army Regulation 420–40. The Army's course of conduct since 1992 therefore was permissible under the NHPA and the Court finds no basis in law on which to require the Army to invest any more funds in the District.

It may seem ironic for the Court to find that Walter Reed violated the NHPA and its own regulations for over eight years and nevertheless to conclude that the Army cannot now be ordered to fix what it undoubtedly broke. Congress has decided as a legislative matter, however, to institutionalize the national commitment to historic preservation by creating certain planning, consultation and decisionmaking procedures to assure adequate consideration of preservationist concerns and *not*, as plaintiffs would have it, by requiring federal agencies to spend the taxpayers' money on historic preservation when it is not earmarked for such purposes.

Lest this conclusion be misunderstood as somehow diminishing the Army's obligations under the NHPA or excusing its derelictions over the years, it should be emphasized that merely because a statutory requirement is described as "procedural" does not render it

---

**19.** *See* A.R. at 1712 (1992–1993 expenditures of $875,619); Henley Decl. ¶ 11–14 (identifying $835,208 spent from April 1994 to first quarter of FY 1996 on repairs and maintenance); A.R. at 1896–1966 (chronicling ongoing daily, weekly and annual maintenance program); *see also* Defs.' Statement of Material Facts ¶¶ 53–55.

any less meaningful or mandatory. As the Fifth Circuit has observed, "[w]hile the [NHPA] may seem to be no more than a 'command to consider,' it must be noted that the language is mandatory and the scope is broad." *United States v. 162.20 Acres of Land, More or Less, Etc.*, 639 F.2d at 302. Merely because "it is impossible for us to know with any degree of certainty just what the end result of the NHPA process would be[, it would be] inappropriate to pre-judge those results ...," or to relieve an agency from its obligation to engage in the process. *Vieux Carre Property Owners v. Brown*, 948 F.2d at 1446–47. Historic preservation by its very nature demands action to stem the otherwise inevitable wear and tear of time itself, and in obeying the NHPA's "command to consider," agencies necessarily will consider taking actions that they might not otherwise even have contemplated. While courts may not be authorized under the NHPA to order a recalcitrant agency to rebuild decaying historic treasures, it is their duty to declare what the agency's statutory obligations are and what the agency's procedural course should be.

As Judge Gasch aptly put it over twenty years ago:

A nation is an entity in many senses beside the political. Shared beliefs and experiences provide the flesh and sinew which cover and unite the bones of political organization. These common beliefs and experiences are nourished, sustained and, indeed, sometimes created by history. Historical knowledge, then, is the life's blood of a people. To cut it off is to assure the eventual disintegration of the political entity. Congress has wisely recognized this and has provided, in the statutes here involved, for a careful consideration of historical values before a project which may destroy those values is begun.

This is not to say, of course, that contemporary needs should be utterly subordinated to the remnants of the past. That would indeed be to crush the present under the detritus of antiquity. All that is required is that the Government agency concerned take into consideration the historical values which may be affected by any planned project. The Congress has provided a procedure whereby this may be done.

*Don't Tear It Down, Inc. v. GSA*, 401 F.Supp. 1194, 1198–99 (D.D.C.1975).

Accordingly, defendants' motion for summary judgment is granted and plaintiffs' motion for summary judgment is denied. The merits having been decided in this fashion, plaintiffs' motion for preliminary injunctive relief necessarily also is denied.

An Order consistent with this Opinion will be entered this same day.

SO ORDERED.

## JUDGMENT AND ORDER

For the reasons stated in the accompanying Opinion issued this same day, it is hereby

ORDERED that Defendants' Motion for Summary Judgment is GRANTED. Judgment is entered for defendants; it is

FURTHER ORDERED that Plaintiffs' Motion for Summary Judgment is DENIED; it is

FURTHER ORDERED that Plaintiffs' Motion for a Preliminary Injunction is DENIED; and it is

FURTHER ORDERED that Defendants' Motion to Strike Affidavits and Exhibits Not in the Administrative Record is DENIED.

SO ORDERED.